RIVERHAWKS; Northwest Rafters Association; Klamath–Siskiyou Wildlands Center, Plaintiffs,

v.

Gilbert ZEPEDA, District Ranger, Ranger, Gold Beach Ranger District; Ann Veneman, Secretary, U.S. Department of Agriculture; U.S. Forest Service, Defendants.

No. CIV.01–3035–AA.

United States District Court,
D. Oregon.

May 14, 2002.

Peter M.K. Frost, Western Environmental Law Center, Eugene, OR, Julia A. Ol-son, Wild Earth Advocates, San Francisco, CA, for plaintiffs.

Michael W. Mosman, United States Attorney, Thomas C. Lee, Assistant U.S. Attorney, Val McLam Black, Special Asst. U.S. Attorney, U.S. Dept of Agriculture, Portland, for defendants.

Paul Turcke, Moore Smith Buxton & Turcke, Boise, ID, for defendant-intervenor Rogue Alliance.

## OPINION AND ORDER

AIKEN, District Judge.

Plaintiffs filed suit seeking declaratory and injunctive relief, claiming that defendants' authorization of motorboat use within the wild segment of the Rogue River violates the Wild and Scenic Rivers Act ("WSRA"), 16 U.S.C. §§ 1271 *et seq*, the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600 *et seq.*, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4331 *et seq.* Plaintiffs seek review of their claims under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–606, arguing that defendants' actions are arbitrary, capricious, and not in accordance with law. Plaintiffs and defendants now move for summary judgment on the issue of liability. Plaintiffs' motion is granted with respect to their NEPA claim, and defendants' motion is granted with respect to all other claims.

## I. BACKGROUND

In 1968, the Rogue River was designated as a component of the national wild and scenic rivers system under the WSRA. 16 U.S.C. § 1274(a)(5). The Rogue Wild and Scenic River ("Rogue WSR") is 84 miles long and is divided into two segments, each managed by a different federal agency. The first segment, approximately 47 miles long, flows from the mouth of the

Applegate River downstream to Marial and is administered by the United States Bureau of Land Management ("BLM"). The second segment, approximately 37 miles long, flows from Marial downstream to the Lobster Creek Bridge and is administered by defendant United States Forest Service ("Forest Service"). Within the second segment is a 33–mile stretch which flows from Grave Creek downstream to Watson Creek and is classified as "wild" under the WSRA. *See* 16 U.S.C. § 1273(b)(1). Within this wild segment, the Forest Service administers a 12–mile stretch of the river from Blossom Bar downstream to Watson Creek. It is this 12–mile segment of the Rogue WSR that is the subject of plaintiffs' suit.

In 1972, the Forest Service and the BLM adopted a joint River Management Plan for the Rogue WSR. *See* 37 Fed.Reg. 13408. At that time, the Oregon State Marine Board ("OSMB") regulated motorized uses of the Rogue WSR. *Id.* at 13410. In 1976, the OSMB began implementing a policy limiting certain motorized uses of the wild section. Administrative Record Compilation of Documents ("AR Comp."), 652–710. Commercial motorboat use was limited to six boat trips per day, and motorized use by commercial fishing guides and private landowners was limited annually to the highest number of trips completed in any one year prior to January 1, 1976. AR Comp. 377–78. Private non-commercial boaters were required to obtain a permit, but there was no limit on the number of permits issued. *Id.;* AR Comp. 699.

Beginning in 1979, the Forest Service acquired regulatory duties over the wild segment, and in 1986, the Forest Service required special use permits for commercial motorboat use pursuant to 36 C.F.R. § 261.58(z). AR Comp. 1173–77. When the Forest Service assumed full regulatory authority over motorized uses in 1986, the

levels of permitted motorized uses were maintained under an agreement with OSMB. AR Comp.1929–41. Subsequently, the Forest Service phased in limits on non-commercial motorized uses.

Currently, the Forest Service issues six permits per day for non-commercial motorized use of the wild section between May 15 and November 15. AR Comp. 4145. The permits may be obtained from the Cougar Lane Store in Agness, Oregon. *Id.* No permit is required for non-commercial motorized use from November 15 to May 15. Private landowners are allowed unlimited motorized use to access their property, and Paradise Lodge has a permit which allows two boat trips per day with a seasonal limit of 180 trips to transport lodge guests. As was established in 1976, commercial tour boat uses of the wild section are authorized through special use permits and limited to six trips per day.

On January 31, 2000, the Forest Service issued a Decision Memo authorizing reissuance of the special use permits through the 2004 season. RogueJets AR, 554B–554D. No public notice or opportunity for comment was given prior to the reissuance of the permits. RogueJets AR, 554C. The Forest Service reissued the special use permits to Mailboat UpRiver Trips, Inc., RogueJets, Inc. (dba Jerry's Rogue Jets), Jack Hunt, Edison Davis, Bill McNair, and Ernie Rutledge. The majority of these permits have been held since the late 1970s or early 1980s. *See* RogueJets AR, 554A.

The Mailboat permit authorizes one commercial tour boat trip per day in the wild section. Mail Boats AR, 269. The RogueJets permit authorizes five commercial tour boat trips per day in the wild section during the permit season. Rogue-Jets AR, 534. The Hunt permit authorizes 271 annual priority days, with 45 outfitter trips allowed annually into the wild sec-

tion. Jack Hunt AR, 162. The Davis permit authorizes 190 annual priority days for commercial fishing tours, with 60 trips allowed annually into the wild section. Edison Davis AR, 284. The McNair permit authorizes 110 annual priority days for commercial fishing guide service, with 45 trips allowed annually into the wild section of the river. Bill McNair AR, 150. Rutledge is authorized 203 priority use days, with 76 outfitter priority trips allowed annually into the wild section. Ernie Rutledge AR, 284. In 1998, after negotiations with several of plaintiffs' representatives, the Forest Service issued a permit to Paradise Lodge for the purpose of transporting lodge guests.[1] See AR Comp. 6196–6199.

Prior to the Decision Memo on January 31, 2000, effects of motorized boat use were analyzed in several studies. See, e.g., AR Comp. 3231, Rogue River User Study: Wild Rogue Planning and Policy Study (Dec.1992) (study by Forest Service and BLM to assess river uses); AR Comp. 3843, Rogue River Erosion/Deposition Study (Dec.1993) (BLM study of motorboat impacts on riverbank erosion and sedimentation); RogueJets AR, 463A–463BK, Effects of Boat Traffic on Juvenile Salmonids in the Rogue River (Dec.1995) (BLM study of motorboat effects on juvenile salmon in recreation section of river); RogueJets AR, 531C–531I, Outfitter Guides and Tour Boats on the Rogue River, Biological Evaluation (Nov.1999) (evaluation of commercial tour boats on sensitive species). In 2001, the Forest Service conducted a survey of the Western Pond Turtle and another erosion study. See AR Supp. Comp 7308–7383, Western Pond Turtle Survey (Oct.2001), and AR Supp.

Comp. 7384–7504, Lower Rogue River Bank Erosion Between Blossom Bar and Foster Bar, and Comparison With Nearby Reaches (Oct.2001). Recently, the Forest Service gave public notice of its intent to revise the 1972 River Management Plan. See Second Declaration of Paul Turcke, Exhibit B.

Plaintiffs seek a declaration that the Forest Service authorized motorboat use within the wild segment of the Rogue River in violation of the WSRA, NFMA, and NEPA, and that the Forest Service's actions are arbitrary, capricious, and not in accordance with law under the APA. Specifically, plaintiffs allege that the Forest Service's authorization of motorboat use in excess of 1968 levels violates WSRA and the River Management Plan. Plaintiffs also contend that the Forest Service's actions violate NFMA by failing to ensure the viability of sensitive wildlife species. Finally, plaintiffs assert that the Forest Service unlawfully issued the special use permits by categorically excluding them from the environmental analyses required by NEPA. Plaintiffs request that the court issue an injunction enjoining motorboat use in the wild section of the Rogue WSR that exceeds 1968 levels and requiring defendants to prepare a recreation plan for the Rogue WSR.[2]

## II. STANDARD OF REVIEW

Neither the WSRA, NFMA, nor NEPA provide a private cause of action for the claims asserted by plaintiffs. See Hells Canyon Alliance v. United States Forest Service, 227 F.3d 1170, 1176 (9th Cir.2000) (WSRA and NEPA); Ecology Center, Inc. v. United States Forest Service, 192 F.3d

---

1. Plaintiffs do not specifically challenge this permit in their Complaint. However, they seek review of private motorboat use. Thus, the Paradise Lodge permit is arguably within the scope of the Complaint.

2. The parties' motions for summary judgment address only the liability of defendants, as the court previously bifurcated the liability and remedial phases of the proceedings.

922, 924–25 (9th Cir.1999) (NFMA). Therefore, plaintiffs must seek review of their claims under the APA. 5 U.S.C. § 702 ("A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute is entitled to judicial review thereof."). Judicial review of an agency action is limited to a "final agency action for which there is no other adequate remedy." 5 U.S.C. § 704; *Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 882, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990).

Under the APA, an agency decision must be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 376, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (arbitrary and capricious standard applies to agency findings which involve agency expertise). Although "this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Consequently, a court "may reverse the agency's decision as arbitrary or capricious only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, offered an explanation that ran counter to the evidence before the agency, or offered one that is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Western Radio Services Co. v. Espy,* 79 F.3d 896, 900 (9th Cir.1996) (citing *Dioxin/Organochlorine Center v. Clarke,* 57 F.3d 1517, 1521 (9th Cir.1995)).

Both parties move for summary judgment. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Here, both parties seek summary judgment based on review of the administrative record. Therefore, no issues of fact preclude summary judgment.

## III. DISCUSSION

### A. Final Agency Action and Standing

Defendants concede that the special use permits issued to commercial boat operators are "final" decisions for purposes of APA review. However, they argue that plaintiffs fail to identify a final agency action to support their challenge of private, non-commercial motorboat use.

Unlike the formal permitting process for commercial motorboats, non-commercial boaters informally acquire a permit at Cougar Lane Store during permit season, subject to availability. No permit is required for non-commercial motorized use from November 15 to May 15 or for non-commercial motorized use by private landowners to access their property. Plaintiffs claim that these decisions by the Forest Service constitute final agency action.

To be final, an agency action must "mark the consummation" of the agency's decision making process, rather than merely be "tentative or interlocutory in nature." *Bennett v. Spear,* 520 U.S. 154, 178, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). The action must also be "one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Id.* (quoting *Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic,* 400 U.S. 62, 71, 91 S.Ct. 203, 27 L.Ed.2d 203 (1970)); *West-*

*ern Radio Services Co., Inc. v. Glickman,* 123 F.3d 1189, 1196 (9th Cir.1997). The finality requirement is jurisdictional. *Ecology Center, Inc. v. United States Forest Service,* 192 F.3d 922, 924–25 (9th Cir. 1999).

■ Plaintiffs maintain that the Forest Service's authorization of non-commercial motorboat·use are not interlocutory or tentative, because motorboats actually use the river pursuant to such authorization. However, plaintiffs do not identify a concrete decision-making process undertaken by defendants which resulted in the authorization of private non-commercial motorboat use. *See Lujan v. ·National Wildlife Federation,* 497 U.S. 871, 890, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) (plaintiffs failed to identify "a single BLM order or regulation, or even to a completed universe of particular BLM orders and regulations" to support their claims). A private boater's act of obtaining a day-use permit cannot be characterized as an agency action subject to judicial review, and the same is true with respect to the absence of a permit requirement between November and May. There simply is no identifiable agency order, regulation, or decision that is "final" within the meaning of the APA.

■ Plaintiffs emphasize that they have no alternative other than to challenge the site-specific authorization of non-commercial motorized use, because the initial decision authorizing such use is not subject to judicial review. The court appreciates plaintiffs' dilemma, but the law is clear that general management decisions are not final agency actions subject to judicial review. *Ecology Center,* 192 F.3d at 925 (citing *Lujan v. Nat'l Widlife Fed'n,* 497 U.S. at 899, 110 S.Ct. 3177). To rule otherwise could result in far-reaching consequences neither anticipated nor desired by

plaintiffs.[3] Therefore, I find that court lacks jurisdiction over plaintiffs' challenge of non-commercial motorboat use, and judicial review of plaintiffs' claims is limited to the special use permits authorizing commercial motorboat use.

With plaintiffs' claims so limited, defendants argue that plaintiffs lack standing to assert their claims. Defendants maintain that plaintiffs fail to allege the specific harm caused by commercial motorboats and fail to explain how such harm will be redressed by the relief sought. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). I disagree.

■ Plaintiffs allege that defendants' failure to limit motorboat use degrades the values for which plaintiffs use and enjoy the Rogue WSR and jeopardizes the viability of the Western Pond Turtle. While plaintiffs do not distinguish between commercial and non-commercial motorboats, I find that plaintiffs allege an injury allegedly caused by defendants' actions. Further, the relief requested would arguably lessen the harm alleged by plaintiffs. Therefore, I will consider plaintiffs' claims.

## B. Motions to·Strike

Defendants move to strike plaintiffs' declarations, arguing that plaintiffs failed to disclose their expert reports as required by discovery rules, and that the expert declarations constitute evidence outside the record. In return, plaintiffs move to strike four expert declarations filed by·defendants on the grounds that the testimony is inadmissible, and a fifth declaration

---

**3.** As defendant-intervenor the Rogue Alliance noted during oral argument, plaintiffs' position would render all permits acquired in a like manner—whether for boating, floating, hiking, or camping—"final" actions subject to judicial review. ·

because the declarant is not qualified as an expert. These motions are denied.

■ The court's review of an agency decision is generally limited to the administrative record that was before the agency at the time of the decision. *Oregon Natural Resources Council v. Lowe*, 109 F.3d 521, 526 (9th Cir.1997). However, the court may consider extra-record material to determine whether the agency has failed to consider all relevant factors "or otherwise swept stubborn problems or serious criticism … under the rug," *id.* at 526–27, when the agency has relied on documents not in the record or when supplementing the record is necessary to explain technical terms or complex subject matter. *Inland Empire Pub. Lands Council v. Glickman*, 88 F.3d 697, 703–04 (9th Cir.1996). The court may further consider external evidence to determine whether the agency has rectified a NEPA violation after the commencement of legal action. *Wilderness Watch v. United States Forest Service*, 143 F.Supp.2d 1186, 1204 (D.Mont.2000).

■ The parties' motions to strike reveal a startling lack of cooperation and collegiality on the part of both counsel, particularly with respect to the parties' dispute over plaintiffs' duty to disclose expert opinions. Counsel quibble over whether plaintiffs were required to disclose their expert opinions by the discovery deadline, whether the parties had a "written" agreement to exchange expert disclosures, and whether defendants had a reciprocal duty to disclose expert opinions. Ultimately, I find no prejudice resulting from plaintiffs' failure to disclose expert opinions, and therefore defendants' motion to strike is denied on this ground.

■ Defendants next assert that plaintiffs cannot challenge the Forest Service's decision through extra-record evidence never presented to the agency. However, defendants cannot assail plaintiffs' failure to submit their expert reports when the Forest Service did not provide public notice or an opportunity for comment regarding the proposal to reissue the special use permits. *See* RogueJets AR, 554C (Forest Service relied on public notice issued in 1994). Further, I find the declarations relevant to determine whether the Forest Service failed to consider a "serious environmental consequence," and therefore defendants' motion to strike is denied.

■ For similar reasons the court denies plaintiffs' motions to strike. Plaintiffs maintain that Colin Peter Dillingham, a Forest Service botanist and wildlife biologist, is not qualified to give expert testimony. Regardless of whether plaintiffs approve of his credentials, Dillingham is an "agency expert," and the Forest Service is entitled to rely on his expertise. *Southwest Center for Biological Diversity v. United States Bureau of Reclamation*, 143 F.3d 515, 523 (9th Cir.1998); *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1332 (9th Cir.1992). Plaintiffs also argue that defendants' remaining declarations are irrelevant, lack foundation and constitute impermissible hearsay and extra-record evidence. I am mindful of the fact that extra-record evidence may not be relied on to determine whether the agency's decision is arbitrary and capricious, except for the limited exceptions set forth above. As with plaintiffs' expert declarations, defendants' expert declarations will be reviewed accordingly.

Finally, the court denies plaintiffs' motion to strike the Second Declaration of William Blackwell, or in the alternative, to respond to the declaration. The court agrees that Blackwell's declaration does not concisely respond to the court's request for identification of all uses authorized under a categorical exclusion. To the extent the declaration is unresponsive, the court will not consider it.

## C. The Wild and Scenic Rivers Act

Plaintiffs contend that defendants' authorization of motorized use in the Rogue WSR violates the WSRA, because the permitted uses exceed levels prescribed by the River Management Plan and degrade the "outstandingly remarkable values" ("ORVs") of the Rogue WSR. *See* 16 U.S.C. § 1271. Further, plaintiffs argue that defendants have failed to draft a recreation management plan for the Rogue WSR as required by the River Management Plan.

### 1. Levels of Motorized Use

 Plaintiffs maintain that the 1972 River Management Plan limits motorized use of the wild segment to 1968 levels, and that defendants have failed to comply with this requirement by authorizing motorized use exceeding those levels. Defendants respond that the Plan simply establishes goals for motorized use rather than mandatory limits.

The Plan provides, in relevant part:

*Wild Area.* Recreation developments will be of a primitive nature and will include only those facilities necessary for sanitation, safety, fire, and site protection and administrative purposes. Recreation use of the Wild River Area will require a maximum degree of outdoor skills. The absence of man-made developments and the unmodified natural environment will dominate.

Boating regulative to achieve the Wild River objectives will be encouraged. The regulations should:

(1) Favor nonmotorized use. Motorboat use from Watson Creek to Blossom Bar will be held to the use level consistent with that of 1968, the year of the Wild and Scenic River Act.

(2) Allow no regularly scheduled commercial motorized boat trips upstream from the Blossom Bar rapids.

Recreationists using the area at any given time will be limited to levels consistent with the Wild River management objectives. No more facilities than are necessary to meet these levels will be provided.

37 Fed.Reg. 13413.

I agree with defendants that the Plan language is suggestive rather than mandatory. Read as a whole, the Plan provides that regulations will be encouraged and that such regulations should favor nonmotorized use by limiting motorized use to 1968 levels. The plain meaning of the phrases "will be encouraged" and "the regulations should" negate any requirement that motorized use "will" be so limited. Therefore, the Plan does not require motorboat use to be limited to 1968 levels.

Even if one could arguably interpret the language as imposing mandatory limits, the court must afford deference to the Forest Service's interpretation of the Plan. *Alaska Center for the Environment v. United States Forest Service*, 189 F.3d 851, 856–57 (9th Cir.1999) ("When reviewing an agency's application of its own regulation, the agency's interpretation of its regulation must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation."). Plaintiffs rely on internal Forest Service communications indicating that the agency has always viewed the language as mandatory. While these documents reflect the desire and intent of the Forest Service to return to 1968 levels, they do not create an enforceable duty. Therefore, I do not find that the Forest Service's interpretation of the Plan is arbitrary or capricious.

### 2. Degradation of River Values

Plaintiffs next argue that motorized use of the Rogue WSR degrades river values by harming fish and wildlife habitat and interfering with non-motorized recreation-

al uses. Specifically, plaintiffs maintain that motorized use "harasses" salmonids, harms the Western Pond Turtle and degrades aquatic habitat by rendering the shoreline devoid of vegetation.

The WSRA created the national wild and scenic rivers system in order that rivers with "outstandingly remarkable scenic, recreational, geologic, fish and wildlife, historic cultural, or other similar values ... be preserved in a free-flowing condition, and ... be protected for the benefit and enjoyment of future generations." 16 U.S.C. § 1271. Accordingly, rivers designated under the WSRA must be managed "in such manner as to protect and enhance the values which caused it to be included in said system without, insofar as is consistent therewith, limiting other uses that do not substantially interfere with public use and enjoyment of these values." *Id.* § 1281(a).

A "wild" river is defined as "free of impoundments and generally inaccessible except by trail, with watersheds or shorelines essentially primitive and waters unpolluted. These represent vestiges of primitive America." 16 U.S.C. 1273(b)(1). Given this definition, it is questionable whether motorized use was intended on rivers designated as "wild." However, the WSRA does not explicitly prohibit motorized uses, and the River Management Plan recognizes motorboat use in the wild section. Moreover, in 1978, Congress specifically excluded the Rogue WSR from the designation of surrounding forest area as "wilderness," a designation which excludes motorized use. 16 U.S.C. § 1133(c).

Furthermore, plaintiffs do not argue that the WSRA prohibits all motorized use in the wild section. *See* Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment, p. 21 ("Plaintiffs emphasize that they have never argued ... that the 'wild' classification of this segment of the Rogue WSR

'implies a prohibition on motorboats.'"). Rather, plaintiffs argue that the current levels of motorized use degrade the values of the Rogue WSR, and that the Forest Service may not allow these levels of motorized use at the significant expense of other river values. Defendants respond that plaintiffs are simply pitting boaters against floaters, giving greater value to their preferred form of recreation. Defendants maintain that commercial motorboat use enhances the recreational value of the river, because it enables more people to view and enjoy the river.

Although the Forest Service must manage the Rogue WSR so as to "protect and enhance" river values, "the WSRA's 'protect and enhance' language does not stand alone." *Hells Canyon Alliance v. United States Forest Service,* 227 F.3d 1170, 1177 (9th Cir.2000). As explained by the Ninth Circuit:

> Congress instructed that designated rivers be managed without, insofar as is consistent [with the values motivating designation of the river], limiting other uses that do not substantially interfere with public use and enjoyment of these values.... Congress thus recognized that other uses could "interfere with public use and enjoyment" but that not all such uses were to be prohibited.

*Id.* (bracketed language in original). Rather, "[o]nly those uses that, consistent with the protection and enhancement of values, 'substantially interfere' with enjoyment and use of the values at issue ... are to be limited." *Id.* at 1177–78.

██ Although defendants acknowledge possible conflicts between motorized and non-motorized recreationists and potential impacts on fish and wildlife, the Forest Service has determined that commercial boat tours enhance the recreational value of the Rogue WSR. Absent evidence that commercial motorized recreation "substan-

tially interferes" with other values of the river, the court must defer to the agency's balance of river values.

Plaintiffs contend that motorboats, in general, degrade the wilderness experience of non-motorized users by emitting excessive noise and creating dangerous conditions through excessive speed and unsafe actions of boat pilots. *See* Declarations of Eric Ludwig, Lloyd Knapp, Larry Owen Laitner, Karen L. Salley, Ralph McDonald, Mathew Flotho, and Joseph Higgins. However, neither the record nor plaintiffs' declarations reflect a significant degree of conflict between commercial tour boats and non-motorized watercraft. Further, in the 1992 River User Study, river users identified both non-motorized and motorized boating as sources of conflict. AR Comp. 3231, pp. 43–44. Although the number of jet boats was cited as a source of concern, the majority of non-motorized users nevertheless indicated a high degree of satisfaction with their Rogue WSR experience. *Id.* at pp. 47–48. Finally, the court notes that commercial tour boats are prohibited on the wild segment upriver from Blossom Bar. Ultimately, it is the agency's role—not the court's—to balance competing recreational uses. *See Hells Canyon Alliance,* 227 F.3d at 1178.

Plaintiffs also argue that commercial motorized use degrades fish and wildlife values by adversely affecting the Western Pond Turtle, juvenile salmonids, and riparian vegetation. *See* Declaration of Dan Holland, Ph.D. (concluding that motorboats are likely to adversely affect turtle behavior and habitat selection by washing turtles from basking sites and triggering escape behaviors); Declaration of Ethen Perkins, Ph.D. (opining that motorboat wakes have a significant adverse impact on riparian vegetation, including loss of critical protective plant cover for salmonids and aquatic animals); and Declaration of Christopher Frissell, Ph.D. (opining that

motorboat activity chronically stresses juvenile and adult salmon by displacing them from coolwater refuges).

Defendants maintain that the studies contained in the record refute plaintiffs' assertions, and they further rebut plaintiffs' experts with expert declarations of their own. *See* Declarations of Peter Klingeman, Connie Risley, Colin Peter Dillingham, Angela Dillingham, and Kenneth Vines. Defendants emphasize that the 1995 Juvenile Salmonid Study found that tour boat operations did not have significant effects on juvenile salmonids. RogueJets AR, 463A–463BK. While the study stated that tour boat use could increase the mortality of juvenile salmonid in areas of gravel nests, it found that the proportion of adult salmon had increased despite an increase in the size and number of tour boats. RogueJets AR, 463C–D.

Defendants also rely on the 1999 Biological Evaluation ("BE") which recognized that tour boats "may affect" the Western Pond Turtles but deemed those effects "speculative." RogueJets AR, 531F. According to a 1997 BE, effects were considered speculative, because "the majority of the turtles are in slow, back water portions of the river that don't receive jet boat traffic" and no documented harm to turtles existed. AR Comp. 5499. Finally, defendants cite the 1993 and 2001 erosion studies which conclude that motorboat wakes have little impact on river bank or bed conditions. AR Comp. 3843, pp. 47, 55; AR Comp. Supp. 7431–32.

 Plaintiffs dispute these studies and question the methods, conclusions, and the qualification of the experts who conducted them. However, "[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Marsh,*

490 U.S. at 378, 109 S.Ct. 1851. The court is not empowered to resolve conflicts between experts or replace the Forest Service's experts with those of plaintiffs. *Id.; Southwest Center for Biological Diversity v. United States Bureau of Reclamation,* 143 F.3d 515, 523 (9th Cir.1998).

I agree with defendants that the record fails to show that commercial motorboats substantial interfere with juvenile salmonids or the Western Pond Turtle. Even if the court accepted the declarations of plaintiffs' experts, they identify potential, rather than actual, impacts on fish and wildlife. Thus, although plaintiffs' expert declarations raise "the specter of interference" with Rogue WSR values, plaintiffs fail to show that *"the extent* to which the agency allows motorized use of the river *in fact* substantially interferes with the river's outstandingly remarkable values." *Hells Canyon Alliance,* 227 F.3d at 1178 (emphasis added); *see Oregon Natural Desert Association v. Singleton,* 47 F.Supp.2d 1182, 1192 (D.Or.1998) (BLM environmental assessment concluded that ORVs of river were negatively affected by livestock grazing); *Oregon Natural Desert Association v. Green,* 953 F.Supp. 1133, 1136–37 (D.Or.1997) (BLM scientists concluded that grazing had broad adverse effects on river values and recommended removal of grazing from river corridor). Furthermore,

> the mere existence of some decline in [fish and wildlife] value does not establish that motorized use substantially interferes with this value, nor does it show that the agency's chosen limitations in striking a balance between the recreation value—which expressly recognizes

the legitimacy of motorized boating—and th[is] value are arbitrary and capricious or fail to protect and enhance the river's value.

*Hells Canyon Alliance,* 227 F.3d at 1178.[4] Absent evidence that the current levels of commercial motorboat use actually degrade river values of the Rogue WSR, "[t]he Forest Service's decisions with respect to what uses are inconsistent with protection and enhancement and 'substantially interfere' with the river corridor's values must be accorded substantial deference . . . ." *Id.* Accordingly, I do not find the authorization of the special use permits arbitrary or capricious under the WSRA.

*3. Recreation Plan Requirement*

Finally, plaintiffs argue that defendants have failed to prepare a recreation plan as required by the River Management Plan. *See* 37 Fed.Reg. 13413 ("A recreation plan will be prepared for the river area."). Defendants respond that the Plan is not enforceable, because it is not a statutorily-mandated duty and it was not promulgated pursuant to rule-making procedures or published as a final regulation. *See Western Radio Services,* 79 F.3d at 901.

For rivers designated as of 1986, the WSRA requires agencies to develop "a comprehensive management plan . . . to provide for the protection of the river values." 16 U.S.C. § 1274(d)(1). Management plans must "address resource protection, development of lands and facilities, user capacities, and other management practices necessary or desirable to achieve the purposes of this chapter." *Id.* For rivers designated before 1986, "plans shall be reviewed for conformity" with these

---

**4.** Plaintiffs attempt to distinguish *Hells Canyon Alliance* by emphasizing that the Hells Canyon Act recognized motorized boating as a valid use of the Snake River. 227 F.3d at 1175–76, 1179. However, motorized use is also recognized as a valid use of the Rogue

WSR, albeit not by statute, and plaintiffs do not argue that motorized boating should be banned from the wild section of the Rogue WSR. Therefore, I do not find such a distinction persuasive.

requirements. *Id.* § 1274(d)(2). The Rogue WSR was designated in 1968; therefore, the 1972 River Management Plan is subject to review for conformity with § 1274(d)(1).

Plaintiffs argue that defendants must comply with the requirements of the River Management Plan in order to conform with the requirements of § 1274(d)(1). However, § 1274(d)(1) does not mandate the creation of a "recreation plan"; it requires only a management plan, such as the 1972 River Management Plan. The question remains whether the Plan's requirements are otherwise enforceable.

■ In 1989, the River Management Plan was incorporated into the Siskiyou National Forest Land and Resource Management Plan ("LRMP"). Under NFMA, site-specific projects must be consistent with the LRMPs. 16 U.S.C. § 1604(i); 36 C.F.R. § 219.10(e) (authorized uses must be consistent with land management plans). Therefore, NFMA renders LRMP requirements enforceable to the extent that proposed agency actions do not conform to the plan. *See Neighbors of Cuddy Mountain v. United States Forest Service,* 137 F.3d 1372, 1377–78 (9th Cir.1998); *Idaho Sporting Congress v. United States Forest Service,* 137 F.3d 1146, 1154 (9th Cir.1998). However, the Forest Service's issuance of special use permits is not necessarily inconsistent with the preparation of a recreation plan, and plaintiffs provide no persuasive authority that the Plan's requirement is enforceable.

The court does not question the need for a comprehensive recreation plan—particularly in light of the fact that the original management plan is now thirty years old and user demand has increased significantly. Indeed, the 1992 River User Study urges river managers to agree on recreational management objectives and to develop a plan for identifying and maintaining acceptable ecological conditions. AR

Comp. 3231, p. 124. The study concludes: "Without ... prudent management action, users with the greatest tolerance for impacts will dictate conditions and river managers will continue to have difficulty maintaining social and environmental quality." *Id.* at p. 129. Regardless, I cannot find that defendants have failed to act in the face of a clear and mandatory duty.

### D. National Forest Management Act

Plaintiffs next claim that defendants' authorization of commercial motorboat use constitutes a failure to protect viable populations of the Western Pond Turtle and its habitat in violation of NFMA.

NFMA imposes substantive duties on the Forest Service, including the duty to provide for "diversity of plant and animal communities." *See Inland Empire Public Lands Council v. United States Forest Service,* 88 F.3d 754, 759 (9th Cir.1996); 16 U.S.C. § 1604(g)(3)(B). The Western Pond Turtle is a sensitive species, and therefore, the duty to ensure viable populations, "applies with special force." *Id.* at 759. Implementing regulations provide that the Forest Service must monitor and evaluate the viability of focal and at-risk species and the ecological conditions that support them. *See former* 36 C.F.R. § 219.19; 36 C.F.R. §§ 219.11(a)(1)(ii); 219.20(a)(1)(ii); 219.20(a)(2)(ii).

Plaintiffs argue that tour boat wakes harm turtles by washing them from basking sites, thus subjecting hatchling turtles to predation and hindering the ability of turtles to properly regulate body temperatures. Plaintiffs allege that boat wakes also harm turtle habitat by reducing shoreline, aquatic, and emergent vegetation. *See* Declaration of Dan Holland (conducted informal preliminary survey of turtle August 28–31, 2001). Although defendants concede that motorized use may cause adverse effects to the turtle, the Forest Ser-

vice has concluded that commercial motorized use will not jeopardize the viability of the turtle population.

As discussed above, 1997 and 1999 BEs assessed the impacts of motorboats on the Western Pond Turtle and other sensitive species. The BEs recognized that motorized use may impact turtles but deemed the impacts "speculative" and unlikely "to limit the local turtle population," presumably because no evidence of such impacts existed. RogueJets AR, 531F; AR Comp. 5499. However, the BEs recognized that no monitoring of the turtle population had occurred and recommended future monitoring to determine the stability and future viability of the turtle population in the Rogue WSR. *Id.* In the summer of 2001, Galea Wildlife Consulting—under contract with the Forest Service—completed a survey of Western Pond Turtles. Galea caught and counted turtles, made a statistical estimation on the turtle population, and noted observations of turtle conduct and habitat conditions.

■ Although the record reflects the acknowledgment that motorboat use may affect the Western Pond Turtle, no evidence suggests that the current levels of commercial motorboat use jeopardize viable populations of the turtle. Rather, as plaintiffs concede, the record fails to support any determination of the viability of the turtle population. *See* Second Declaration of Dan Holland, pp. 6–7. I recognize that little evidence exists regarding the turtle population precisely because the Forest Service failed to conduct any type of population or habitat analyses until 2001. However, absent evidence of jeopardy to population viability, I cannot find

that the issuance of the special use permits violates defendants' substantive duties under NFMA.

Of greater concern is defendants' utter failure to monitor the turtle or formulate a monitoring program, despite the requirements under NFMA that they do so. However, defendants have begun monitoring the turtle, and therefore, this court cannot review the sufficiency of their monitoring efforts or find that defendants have failed to act.[5] *See* 5 U.S.C. § 706(1); *Ecology Center*, 192 F.3d at 925, 926 (court cannot review sufficiency of agency monitoring, and can compel agency action only when "there is a genuine failure to act").

### E. National Environmental Policy Act

Plaintiffs allege that the special use permits violate NEPA, because the permitted actions significantly affect the environment and require the preparation of an Environmental Assessment ("EA") and Environmental Impact Statement ("EIS") before they can be issued. *See* 42 U.S.C. § 4332(2)(c); 40 C.F.R. § 1508.18(a).

NEPA requires all federal agencies to prepare a detailed EIS for "every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Under Council for Environmental Quality ("CEQ") implementing regulations, an agency must prepare an environmental assessment ("EA"), a brief preliminary evaluation, to determine whether a proposed action may significantly effect the environment such that an EIS is required. 40 C.F.R. § 1508.9. If

---

5. Regardless, plaintiffs do not seek an injunction requiring defendants to engage in population and habitat analyses required by NFMA. Rather, plaintiffs simply seek to enjoin and limit motorboat use in the Rogue WSR. *See* Complaint, ¶ 34 and p. 11. At oral argu-

ment, plaintiffs explained that because the issues of liability and remedies were bifurcated, it was inappropriate for plaintiffs to request such relief at this time. However, these issues were not bifurcated at the time plaintiffs filed their complaint.

no significant effects are found, the agency may issue a finding of no significant impact. *Id.*

An agency may dispense with the environmental analysis required by NEPA if the action falls under a categorical exclusion. A categorical exclusion is defined as "a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect ... and for which, therefore, neither an environmental assessment nor an environmental impact statement is required." 40 C.F.R. § 1508.4; *see also* 36 C.F.R. § 215.2.

 Agencies must adopt procedures that include "specific criteria for and identification of" categorical exclusions. 40 C.F.R. § 1507.3. If a proposed activity fits within a categorical exclusion, NEPA review is unnecessary unless "extraordinary circumstances" related to the proposed action exist. 40 C.F.R. § 1508.4. Extraordinary circumstances are those "in which a normally excluded action may have a significant environmental effect." *Id.* However, an agency may issue a categorical exclusion even where such "extraordinary circumstances" are present, so long as the agency determines that its action will not have a detrimental effect. *Southwest Center for Biological Diversity v. United States Forest Service,* 100 F.3d 1443, 1450 (9th Cir.1996) (citing *Pyramid Lake Paiute Tribe v. United States Dep't of the Navy,* 898 F.2d 1410, 1416, 1420 (9th Cir. 1990)).

To determine whether the proposed action presents extraordinary circumstances, the agency utilizes an internal scoping process. *Alaska Center,* 189 F.3d at 858. The scoping process is used to "determine the scope of the issues to be addressed and for identifying the significant issues related to a proposed action." 40 C.F.R. § 1501.7.

*1. Categorical Exclusion in Wild and Scenic River Area*

Plaintiffs first argue that the Forest Service Manual identifies proposed activities within "[c]ongressionally designated areas, such as wilderness, wilderness study areas, or National Recreation Areas" as extraordinary circumstances. Forest Service Manual § 30.3(1)(b)(2)(d). Thus, plaintiffs argue that the categorical exclusion of special use permits is unlawful, because the Rogue WSR is a congressionally designated area. Defendants respond that plaintiffs cannot rely on the Forest Service Manual, because "it does not have the independent force and effect of law." *Southwest Center,* 100 F.3d at 1450; *but see High Sierra Hikers Ass'n v. Powell,* 150 F.Supp.2d 1023, 1044 (N.D.Cal.2001) (relying on Forest Service Manual in finding that Forest Service violated own policies by issuing categorical exclusion in an area where endangered or threatened species were present).

 I disagree with plaintiffs' argument, though for different reasons. If construed as plaintiffs suggest, the mere fact of a congressionally-designated area would preclude a categorical exclusion for any proposed action, no matter how minor or inconsequential. Such an interpretation runs counter to the very purpose for which a categorical exclusion is allowed. Instead, I find persuasive the analysis of the district court in *Utah Environmental Congress v. United States Forest Service,* Case No. 2:01–CV–00390B (D.Utah, June 19, 2001), where the court determined that a similar provision of the Manual could not be determined by its plain language and thus deferred to the reasonable interpretation of the Forest Service that "extraordinary circumstances" are not created by the mere presence of some factor. *Id.* at *3–8 (attached as Exhibit E to Second Declaration of Paul Turcke); *cf. Southwest Cen-*

*ter*, 100 F.3d at 1450 (categorical exclusion may be issued if action will not cause negative impacts).

### 2. Categorical Exclusion Criteria

Next, plaintiffs argue that the special use permits do not fit within the categorical exclusion relied upon by defendants. Here, the Forest Service relied on a category excluding the "Approval, modification, or continuation of minor special uses of National Forest System lands that require less than five contiguous acres of land." 57 Fed.Reg. 431180, 431209; Forest Service Manual, § 31.2(3)(a). Included as an example of such use is "the continued use of land where such use has not changed since authorized and no change in the physical environment or facilities are proposed." *Id.*

Plaintiffs argue that the special use permits do not authorize uses which are "minor" or limited to five contiguous acres of land, because they authorize repeated motorboat use in the wild section of the Rogue WSR for five years.

■ When reviewing an agency's interpretation of its own regulation, the agency's interpretation should be given controlling weight unless it is plainly erroneous or inconsistent with the regulation. *Alaska Center*, 189 F.3d at 857. Under this deferential standard, I find that the Forest Service's interpretation of its categorical exclusion is neither plainly erroneous nor inconsistent with the regulation. Motorboat use of the river does not require five contiguous acres of land; such a restriction necessarily applies to forest lands rather than the waterways within them. Furthermore, the special use permits fit within the exclusion to the extent that they approve continued uses that are unchanged and do not alter the physical environment.

### 3. Significant Effects on the Environment

Finally, plaintiffs argue that extraordinary circumstances preclude a categorical exclusion of the special use permits, because motorized use of the Rogue WSR significantly affects juvenile salmonids, Western Pond Turtles and riparian vegetation.

■ In the Decision Memo authorizing the special use permits, the Forest Service determined that:

> There would be no significant adverse effects to the resources of the area if this proposal were implemented. This proposal may impact western pond turtles, but no mitigation measures are required at this time. There would be no effect to other threatened, endangered, or sensitive wildlife and plant species. Transboundary Coho Salmon are currently listed as Threatened under the Endangered Species Act. This proposal has a likely to adversely affect determination. The National Marine Fisheries Service concluded on the Siskiyou National Forest's Program of motorized boat use. On August 15, 1997, an incidental take permit was issued for likely to adversely affect actions within that program. This proposal is within the scope of the take permit, and no additional consultation is required.

RogueJets AR, 554C.

The Decision Memo alone fails to support a categorical exclusion of the special use permits. It explicitly states that the permitted actions "may affect" the Western Pond Turtle and are likely to adversely effect threatened coho salmon. A categorical exclusion, however, is appropriate only when the agency determines that the proposed action will have "no effect" on the environment. 40 C.F.R. § 1508.4; *Southwest Center*, 100 F.3d at 1450. The

record also reflects the potential for impacts on turtles and salmon, as well as conflicts between various user groups.

First, the 1997 and 1999 BEs conclude that motorboats "may effect" the Western Pond Turtle. RogueJets AR, 531F; AR Comp. 5499. While the BEs deem these effects speculative and as requiring no mitigation efforts, the Decision Memo gives no explanation for the agency's apparent conclusion that the effects are insignificant and that no mitigation efforts are necessary. *See Alaska Center,* 189 F.3d at 859 ("The agency must supply a convincing statement of reasons why potential effects are insignificant.").

Defendants cannot rely on the 2001 turtle survey to support the Decision Memo, because the survey "constitutes post-decision information, which may not be advanced as a new rationalization for either sustaining or attacking an agency's decision." *Southwest Center,* 100 F.3d at 1450; *see also Alvarado Community Hospital v. Shalala,* 155 F.3d 1115, 1124 (9th Cir. 1998), *as amended by,* 166 F.3d 950 (9th Cir.1999) ("[E]xplanatory materials cannot be used to offer new rationalizations for agency action."). Regardless, the turtle survey does not support the categorical exclusion of commercial motorboat use. For example, the survey notes that in addition to motorized uses, non-motorized uses may impact the turtles. AR Supp. Comp. 1720. Yet, the Forest Service failed to consider the relationship between commercial motorboats and other uses which may cumulatively impact the turtles. *See* 40 C.F.R. § 1508.27 (agency must consider whether the action is related to other action which have individually insignificant, but cumulatively significant impacts). Further, the survey notes observations that tour boats may disturb turtles when in close proximity, and that motorboat wakes occasionally wash turtles from basking sites. AR Supp. Comp. 1722. Thus,

the record supplement does not support a finding that the permitted uses have "no effect" on the Western Pond Turtle.

Second, the 1995 study on juvenile salmonids concluded that motorboats use may affect the fish. As the Decision Memo reflects, the Forest Service consulted with the National Marine Fisheries Service, because the issuance of the special use permits "has a likely to adversely affect determination." RogueJets AR, 531A, 554C. The fact that the Forest Service deemed the permit renewals within the scope of the incidental take permit does not negate the presence of extraordinary circumstances.

Next, the record includes no consideration of the effects on salmon and turtle habitat or riparian vegetation. Defendants proffer the declarations of Colin Peter Dillingham, a Forest Service botanist, and Connie Risley, a Forest Service hydrologist, to rebut plaintiffs' contentions that motorboat wakes may affect riparian vegetation. Dillingham and Risley hypothesize about causes of erosion other than motorboat wakes, such as differing shoreline geology and high water flows. However, defendants cannot rely on posthoc rationalizations to support the Forest Service's decision to issue special use permits.

Finally, the record reflects the potential for conflicts between commercial tour boat use and non-motorized user groups. RogueJets AR; AR Comp. 3231, pp. 43–44, 58–62, 91–95, 121.

Unlike the WSRA or NFMA, NEPA does not impose substantive duties on an agency; rather, "NEPA exists to ensure a process, not particular substantive results." *Hells Canyon Alliance,* 227 F.3d at 1177. Therefore, NEPA does not require a finding that an agency action will degrade river values or jeopardize wildlife before its procedural requirements are

triggered. It requires only a finding that a proposed action "may significantly affect the environment." 40 C.F.R. § 1508.4. Here, the record clearly establishes the presence of potentially significant effects.

Despite the presence of potential impacts, the Forest Service failed to engage in any scoping process before issuing the special use permits. Instead, defendants relied on the notably skimpy scoping process conducted in December, 1994, regarding the reissuance of the special use permits at that time.[6] Defendants' failure to pursue scoping violates their own regulation requiring public notice and comment for special use applications. 36 C.F.R. § 251.54(g)(2)(ii) ("Federal, State, and local government agencies and the public shall receive adequate notice and an opportunity to comment upon a special use proposal accepted as a formal application in accordance with Forest Service NEPA procedures."). Moreover, the lack of scoping process eliminated a thorough consideration of possible impacts and thus undermines the Forest Service's conclusions.

 Under NEPA, the court must ensure that defendants have taken the requisite "hard look" at the environmental consequences of its proposed action and that the agency decision is "founded on a reasoned evaluation of the relevant factors." *Greenpeace Action v. Franklin,* 14 F.3d 1324, 1332 (9th Cir.1992) (citing *Marsh,* 490 U.S. at 373–74, 109 S.Ct. 1851 (internal quotations omitted)). Here, defendants' Decision Memo provides little "reasoned" basis for the action taken. Accordingly, I find that the categorical exclusion of the special use permits is arbitrary and capricious and not in accordance with the requirements of NEPA.

### CONCLUSION

Plaintiffs fail to allege a final agency action to support their challenge to private non-commercial motorboat use of the Rogue WSR. Further, plaintiffs fail to show that the Forest Service's decision to special issue permits for commercial tour and fishing boats was arbitrary or capricious under the WSRA or NFMA. However, by issuing such permits through categorical exclusion, the Forest Service violated the procedural requirements of NEPA. Accordingly, plaintiffs' and defendants' Cross–Motions for Summary Judgment (docs. 63 and 137) are GRANTED in part and DENIED in part. Plaintiffs' motion is granted with respect to their NEPA claim and denied as to all other claims. Defendants' motion is denied with respect to plaintiffs' NEPA claim and granted with respect to all other claims. It is further ordered that defendants' Motion to Strike (doc. 121), and plaintiffs' Motions to Strike (docs. 142 and 146) are DENIED.

The parties shall confer and submit a stipulated briefing schedule for the remedial phase of the proceedings. The court shall schedule oral argument, if deemed necessary, upon review of the briefing.

IT IS SO ORDERED.

---

**6.** On December 7 and 14, 1994, defendants published a notice in the Curry County Register that the Gold Beach Ranger District was seeking public comment on its proposal to reissue existing special use permits for commercial tour boats for scenic and fishing trips. AR Comp. 411D. The notice required public comments to be submitted by December 21, 1994. Defendants also maintain that notice was mailed to interested persons and organizations. However, the record contains no evidence that the mailings occurred. One favorable response was submitted. *Id.*