AMERICAN WHITEWATER; American Canoe Association; Georgia Canoeing Association; Atlanta Whitewater Club; Foothills Paddling Club; Western Carolina Paddlers; Joseph C. Stubbs; Bruce A. Hare and Kenneth L. Strickland, Plaintiffs,

v.

Thomas TIDWELL, in his official capacity as Chief of the United States Forest Service; the United States Forest Service, an agency of the United States Department of Agriculture; Thomas Vilsack, in his official capacity as Secretary of the United States Department of Agriculture; and the United States Department of Agriculture, Defendants,

Richard Rust; Henry Rust; Goodenow, LLC; and Georgia ForestWatch, Intervenors.

Civil Action No. 8:09–2665–MGL.

United States District Court, D. South Carolina, Anderson Division.

July 30, 2013.

Cecil Huron Nelson, Jr., J. Nathan Galbreath, Nelson Galbreath, Greenville, SC, Jeffrey Prudhomme, Patton Boggs, Dallas, TX, R. Brian Hendrix, Patton Boggs, Washington, DC, for Plaintiffs.

John H. Douglas, U.S. Attorneys Office, Charleston, SC, John Pershing Tustin, U.S. Department of Justice, Washington, DC, for Defendants.

Alan Rhys Jenkins, Jenkins at Law, Marietta, GA, William Stevens Brown, Anna Elizabeth Hamilton, Nelson Mullins Riley and Scarborough, Greenville, SC,

Henry L. Hamilton, Christopher Alan Brookhart, Hamilton and Associates, Columbia, SC, for Intervenors.

### AMENDED ORDER and OPINION

MARY G. LEWIS, District Judge.

Plaintiffs American Whitewater, American Canoe Association, Georgia Canoeing Association, Atlanta Whitewater Club, Foothills Paddling Club, Western Carolina Paddlers, Joseph C. Stubbs, Kenneth L. Strickland, and Bruce A. Hare (collectively "Plaintiffs" or "American Whitewater")[1] brought this action alleging that the United States Department of Agriculture ("USDA"), through its agency, the United States Forest Service ("Forest Service") (collectively with the named agency defendants and named individual defendants in their official capacity (collectively ("The Forest Service" or "Defendants")[2], unlawfully infringed upon American Whitewater's federally-protected right to recreate on the Chattooga Wild and Scenic River ("WSR") (the "Chattooga") upstream of South Carolina Highway 28 (the "Headwaters" or "Upper Chattooga") by way of hand-powered boating or floating.[3] The Headwaters is the section of the Chattooga WSR above Highway 28 and is defined as the portion between Grimshawes Bridge in North Carolina and the Highway 28 Bridge in South Carolina and covers approximately 21 river miles. (AR025: 01957). The court previously granted Intervenors Henry Rust, Phillip Rust, Richard Rust, and Goodenow LLC's ("The Rust Family") and Georgia ForestWatch's Motions to intervene[4]. (ECF Nos. 66 & 168).

This matter is currently before the court on Motions for Judgment on the Administrative Record filed by all parties. (ECF Nos. 230, 231, 232, & 233). The court held a hearing on these motions on February 27, 2013. For the reasons set forth herein, the court GRANTS Defendants' Motion for Judgment on the Administrative Record.

### BACKGROUND

The Chattooga is one of the longest and largest free-flowing mountain waterways in the Southeast remaining in a relatively undeveloped condition. (AR001: 00009)[5]. The river, which is 57 miles long, originates in western North Carolina and flows south to form the border of northwestern South Carolina and northeastern Georgia. (AR350:14358–14359). The waters of the Chattooga run through the Nantahala, Chattahoochee–Oconee, and Sumter National Forests ("NFs") before eventually descending into Georgia's Tugaloo Reservoir. (AR002:00186). On June 15, 1971, the Forest Service issued the Wild and Scenic River Study Report for the Chattooga River ("1971 Study") providing descriptions of the river and adjoining lands and outlining several recommendations and considerations for Congress prior to the river's designation as a WSR. (AR001:00001–00185).

---

1. The terms "American Whitewater" and "Plaintiffs" are used interchangeably herein.

2. The terms "The Forest Service" and "Defendants" are used interchangeably herein.

3. The terms "floating" and "boating" are used herein to describe water activities such as non-commercial, non-motorized methods of whitewater river floating or boating, including canoeing, kayaking, whitewater rafting, or other similar paddling activities.

Floaters or boaters are used to describe those who engage in these activities.

4. The court granted Georgia ForestWatch's Motion to Intervene for the limited purpose of defending against American Whitewater's claims for declaratory and injunctive relief. (ECF No. 168).

5. The acronym "AR" as used herein references the Administrative Record.

In 1974, Congress designated the entire Chattooga River and its 15,432 acre corridor as a part of the Wild and Scenic Rivers System ("WSRS") under the Wild and Scenic Rivers Act ("WSRA") (16 U.S.C. §§ 1274(a)(1)–1287) based on the 1971 Study. (AR400:16697 & AR001:00001–00185). Under this designation, the river was and is protected as a valuable natural resource to be preserved for present and future use. *See* 16 U.S.C. § 1271. Portions of the Chattooga WSRA corridor are located within three states—North Carolina, South Carolina, and Georgia (AR002:00186) and can be divided into six distinctive sections under the "Guidelines for Evaluating Wild and Scenic River Areas Proposed for Inclusion under the National Wild and Scenic Rivers System." (AR001:00072). Section I of the Chattooga WSR covers 5.5 miles of the Headwaters from 0.8 miles below Cashiers Lake to 0.2 miles above Norton Mill Creek. (AR001:00072–75). Section II of the Chattooga WSR covers 15.9 miles beginning 0.2 miles above Norton Mill Creek to Nicholson Fields. (AR001:00075–77). Section III of the Chattooga WSR covers 6.1 miles of the river from Nicholson Fields to 2 miles below the Highway 28 Bridge at Turnhole. (AR001:00077–78). Sections IV through VI of the Chattooga WSR are located on the lower portion of the river. (AR001:00078–80). Under the WSRA, the USDA is in charge of managing the Chattooga in compliance with the Act, and the USDA primarily executes its management responsibilities through the Forest Service. *See* 16 U.S.C. § 1281(d).

On March 22, 1976, the Forest Service published its Chattooga Wild and Scenic Development Plan [6] in the Federal Register ("1976 Plan"), in an effort to manage the resources available at and around the

Chattooga. (AR002:00186–96). Over the years, the Forest Service has enacted various Plans for the management and oversight of the Chattooga WSR, the relevant portions of which are summarized hereafter.

### The 1976 Plan

The 1976 Plan allowed non-motorized boating on the lower two-thirds of the Chattooga, but prohibited all boating on the Headwaters. (AR002:00191 & AR400:16697). In 1978, the Forest Service promulgated final regulations (36 C.F.R. § 261.77) which prohibited all private and commercial boating on the Chattooga River on the Georgia and South Carolina portions except where permits were provided by the Forest Service. (AR400:16758). The summary of the agency action indicated that permits would "include conditions of use to protect river values and provide for floater safety." *See* Permits for Chattooga River, 43 Fed.Reg. 3706–01 (Jan. 27, 1978) (codified at 36 C.F.R. pt. 261).

### The 1985 Plan

The 1985 Sumter Forest Land Resource Management Plan ("1985 Plan"), like the 1976 Plan, allowed floating on the lower two-thirds of the Chattooga and precluded floating on the Headwaters. (AR006:00301–19). The 1985 Plan provided that "[f]loating is limited to the 26 mile portion below Highway 28 Bridge and the West Fork's lower 4 miles in Georgia" and would be prohibited on the Headwaters. (AR007:00322). The 1985 Plan also established that administrative responsibility for the Chattooga was divided among the supervisors for the three relevant NFs. (AR007:00324).

### The 2004 Plan

In 2002, the Forest Service approved an amendment to the 1985 Plan which altered

---

**6.** The terms "Plan," Land Resource Management Plan or "LRMP," "Decision," and "Decisions" are used interchangeably in this order.

some of the provisions regarding boating on the lower portion of the river, but this amendment did not propose any changes to the provisions for the Headwaters. (AR400:17146). Then, on April 7, 2003, the Forest Service released a Draft Environmental Impact Statement ("DEIS") for a revised plan. (AR019:01171). The DEIS proposed altering some of the provisions regarding boating on the lower portion of the river, but maintained the boating prohibition on the Headwaters. (AR021:01929–30). The Regional Forester, who reports to the Chief of the Forest Service and manages one of nine geographic regions of the National Forest System, signed a Record of Decision ("ROD") in January 2004 that adopted the Revised Forest Plan ("2004 Plan"). (AR021:01914–42 & 36 C.F. R. § 200.2). In April 2004, American Whitewater lodged an administrative appeal of the 2004 Plan that banned floating on the Headwaters. (AR025:01951–02045) Thereafter, on April 28, 2005, the Forest Service's Reviewing Officer granted American Whitewater's administrative appeal and explained that:

> After careful review of the record ... I am reversing the Regional Forester's 2004 Decision to continue to exclude boating on the Chattooga [Headwaters]. I find the Regional Forester does not provide an adequate basis for continuing the ban on boating above Highway 28. Because the record provided to me does not contain the evidence to continue the boating ban, his decision is not consistent with the direction in Section 10(a) of the WSRA or Sections 2(a) and 4(b) of the Wilderness Act or agency regulations implementing these Acts.

(AR054:02120).

The Forest Service's Reviewing Officer directed the Regional Forester to reassess the boating prohibition as part of a broader examination of visitor use capacity issues on the upper segment of the Chattooga and required the Regional Forester to conduct appropriate visitor use capacity analyses, including an analysis of noncommercial boating use. (ARO54:02120–21). Based upon the results of the visitor use capacity analysis, the Regional Forester was required to adjust or amend, as appropriate, the 2004 Plan to reflect a new decision based on the findings. *Id.* Due to the Forest Service's appeals procedures, the pre-existing prohibition on boating above Highway 28 set forth in the 1985 Plan remained in effect pending the results of the visitor use capacity analysis. (AR054:02120).

Thereafter, American Whitewater filed suit in the United States District Court for the Northern District of Georgia challenging the decision to revert to the 1985 Plan for the interim management of the Headwaters. *American Whitewater, et al. v. Bosworth, et al.,* C.A. No. 2:06–cv–00074–WCO (N.D.Ga. Oct. 6, 2006). American Whitewater requested the court set aside the 2005 decision that banned boating on the Headwaters until the Forest Service issued an amendment to the 2004 Plan. *Id.* The court denied American Whitewater's request for relief on the grounds that the court lacked standing and because the issue was not ripe for review. *Id.*

### The 2009 Plan

Over the next few years, the Forest Service conducted a visitor use capacity analysis and other studies, held public meetings, and solicited public comment on recreation along the Chattooga. (AR400:16763–65; *see also* AR400:16702–06). The Forest Service received over 3,000 comments on the studies and proposed plan amendments (AR400:16705), and issued an Environmental Assessment ("EA") on Managing Recreation Uses on

the Upper Chattooga River in August 2009. (AR224:09716–09915). On August 25, 2009, the Forest Supervisors for the Sumter, Chattahoochee–Oconee, and Nantahala NFs signed a Decision Notice and Finding of No Significant Impact ("DN/FONSI") to amend their respective Land Resource Management Plans ("LRMPs") ("the 2009 Plan"). (AR221:09661; AR221:09674; AR222:09679; AR223.1:09699). The 2009 Plan allowed limited non-motorized, non-commercial boating or floating on the Headwaters for the first time since the Chattooga's designation as a WSR. Floating was limited to a seven-mile long section starting at the confluence of Norton Mill Creek in North Carolina south to Burrells Ford Bridge in South Carolina (not including the tributaries) during the months of December, January and February when the river was flowing at less than 450 cubic feet per second ("cfs") or higher. (AR221:09663–64; AR224.0:09731).

American Whitewater and others brought administrative appeals challenging the 2009 Plan. On October 14, 2009, and prior to the Forest Service's final decision on those appeals, American Whitewater also filed this action challenging the 2009 Plan. (ECF No. 1). American Whitewater alleged in its complaint that the Forest Service's actions violated the Administrative Procedure Act ("APA"), the WSRA (16 U.S.C. § 1271 *et seq.*), the Wilderness Act (16 U.S.C. § 1131 *et seq.*), the Multiple–Use Sustained–Yield Act ("MUSYA") (16 U.S.C. § 528 *et seq.*), the National Forest Management Act ("NFMA") (16 U.S.C. § 1600 *et seq.*) and its implementing regulations (36 C.F.R. §§ 219.1–219.29), the National Environmental Policy Act ("NEPA") (42 U.S.C. §§ 4321–4370) and its implementing regulations (40 C.F.R. Parts 1500–1508), United States Forest Service regulations and decisions, and the United States Constitution. (ECF No. 219 at 3). American Whitewater sought a tem-

porary restraining order ("TRO") and a preliminary injunction to require the Forest Service to entirely lift its ban of recreational floating on the Headwaters. (ECF No. 15 at 3). On October 15, 2009, the court denied American Whitewater's Motion for a Temporary Restraining Order. (ECF No. 30). Later, on December 2, 2010, the court denied American Whitewater's Motion for a Preliminary Injunction and American Whitewater's related motion to reconsider the request for a TRO. (ECF No. 95).

On December 18, 2009, just days before the deadline to file an answer in the instant action, the Forest Supervisors for the Sumter, Chattahoochee–Oconee, and Nantahala NFs withdrew the 2009 Plan. (AR330:13403). The Reviewing Officer dismissed the pending administrative appeals on the same date based on the withdrawal of the 2009 Plan. (AR331:13406). With the 2009 Plan withdrawn, the preexisting prohibition on boating on the Headwaters remained in effect. (AR400:16698). On December 28, 2009, the Rust Family, a private land owner whose land is adjacent to the Chattooga, moved to intervene and to dismiss American Whitewater's suit. (ECF Nos. 43 & 68.) The court *inter alia* granted the motion to intervene and denied the motion to dismiss. (ECF No. 68 & 95).

On December 9, 2010, the Forest Service released a "scoping letter," thereby reinitiating the National Environmental Policy Act ("NEPA") process that began in the years leading up to the establishment of the 2009 Plan. (AR338.0:20990–92). The letter asked the public to identify any new information or concerns the Forest Service should analyze with regard to recreation on the Headwaters. The letter noted that comments previously submitted between 2005 and 2009 would be considered in the decision-making process. *Id.* The Forest

Service received additional comments during the 2010 scoping period. (AR400:16706). The Forest Service also provided the pre-decisional EA to the public and received additional comments during the six-week comment period. *Id.*

American Whitewater filed an amended complaint on January 31, 2011, which asserted the same causes of action as those asserted in its initial complaint but also narrowed the scope and breadth of its prior arguments, added arguments directed toward the Rust Family Intervenors, and dispensed with its arguments concerning navigability of the portion of the river flowing through the Rust Family's property. American Whitewater also alleged that the Forest Service unlawfully failed to study and properly manage the 1.7 mile section of the river that flows through the Rust Property. (Compare ECF No. 1 ¶¶ 296–304 with ECF No. 103 ¶¶ 174–85). Although, in its amended complaint (ECF No. 103) American Whitewater stated that it was no longer challenging navigability or ownership of the Rust Family's property, the Rust Family nevertheless filed a cross-claim and a counterclaim seeking declaratory relief from any claims against their title or ownership rights. (ECF No. 117).

Georgia ForestWatch, a not-for-profit organization that is dedicated to the preservation and enjoyment of forests in their natural, pristine state, sought leave to intervene in this matter on August 31, 2011, alleging a "direct and legally protectable interest in the Forest Service's management policy at issue." (ECF No. 139 at 2). On May 1, 2012, the court granted Georgia ForestWatch's motion to intervene for the "limited purpose of defending against American Whitewater's claims for declaratory and injunctive relief." (ECF No. 168).

### The 2012 Plan

In January 2012, the Forest Service issued an EA for Managing Recreation Uses in the Upper Segment of the Chattooga Wild and Scenic River Corridor. (AR400:16692–17192). Within this EA, the Forest Service developed several alternatives that would preserve the Chattooga's free flowing condition, protect its water quality and "protect and enhance" its specific ORVs as required by the WSRA. (AR400:16699–16718). All alternatives:

> [p]reserve the Chattooga WSR's free-flowing condition, protect its water quality and protect its ORVs as required by the WSRA. All alternatives also preserve the wilderness character of Ellicott Rock Wilderness as required by the Wilderness Act. However, the alternatives vary the type and amount of recreation use, as well as other management actions, on different reaches of the upper river segment to assess the trade-offs of providing different mixes of high-quality recreation opportunities. The scope of the alternatives is limited to providing management direction for the upper segment of the Chattooga WSR, consistent with the appeal decision described in the purpose and need.

(AR400:16718).

The Forest Supervisors for the three affected NFs each signed a DN/FONSI based on the revised EA in January 2012. (AR402:17195–97; AR403:17224–26; AR404:17252–79). On June 28, 2012, the Reviewing Officer for the Forest Service denied all administrative appeals and affirmed the Forest Supervisors' 2012 Plan (AR533:26117–78) (American Whitewater); (AR535:26188–89) (Georgia ForestWatch); (AR536:26229–30) (Rust Family). On August 13, 2012, the Forest Service declined discretionary review of the 2012 Plan. (AR545:26425) (Georgia ForestWatch); (AR547:26427) (American Whitewater); (AR548:26428) (the Rust Family). While the instant action was pending, the August

13, 2012, letters became the final agency action for the 2012 Plan.

The 2012 Plan retains the prohibition on commercial boating above the Highway 28 Bridge but allows for non-motorized, non-commercial boating on the Headwaters on approximately 17 miles of the 21–mile main stem of the upper segment of the Chattooga WSR from the Green Creek confluence downstream to a designated take out within one-quarter mile downstream of the Lick Log Creek confluence. (R402:17202; AR 403:17230; and AR404:17258). Boating is allowed for five months of the year between December 1 and April 30 during daylight hours when flows reach 350 cfs or greater at the USFS Burrells Ford gauge. (AR404:17258). The 2012 Plan also requires boaters to self-register before floating on the Headwaters at kiosks at four trail head locations: Green Creek, Norton Mill Creek, Bullpen Bridge, and Burrells Ford Bridge. (AR467:20110–11; see AR400:17102) (implementation of Alternative 13A[7]). Boating groups on the Headwaters are limited to a maximum group size of six people and a minimum group size of two boats. (AR404:17272).

On December 10, 2012, American Whitewater filed a second amended complaint challenging the 2012 Plan claiming that the Forest Service's floating restrictions, like those in the 2009 Plan, are not in accordance with federal law and seeking declaratory and injunctive relief. (ECF No. 219). The second amended complaint also requests a remand of the 2012 Plan to the Forest Service with instructions for the Forest Service to publish a revision to the 2012 Plan to be effective within one year. American Whitewater asks that floating access to the Chattooga to be no less than what was set forth in the 2012 Plan until a

new revised plan becomes effective. American Whitewater also asks the court to require the Forest Service to manage the Headwaters in accordance with federal law and their own policies. The Rust Family filed an answer and crossclaim on December 21, 2012, also challenging the Forest Service's 2012 Plan. (ECF No. 225 at 50–51).

On December 12, 2012, Georgia Forest-Watch filed a separate lawsuit against the Forest Service which is currently pending before the court. (No. 8:12–cv–3455–MGL). Georgia ForestWatch, however, does not have any claims pending in the instant action and has not sought to alter its intervenor status nor raised any cross-claims or counterclaims in its answer to American Whitewater's second amended complaint. (ECF No. 226).

### STANDARD OF REVIEW

 Judicial review of federal agency action is made available through the APA. 5 U.S.C. §§ 701–706; *Ohio Valley Envt'l Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir.2009). The party seeking review under the APA must show that he has "suffer[ed] legal wrong" because of the challenged agency action, or is "adversely affected or aggrieved" by that action "within the meaning of a relevant statute." *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 884, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). Further, the party challenging the agency action must set forth specific facts to show that it is entitled to relief. *Id.* at 884, 110 S.Ct. 3177.

 Under the APA, agency action must be upheld unless the action is found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

---

**7.** 13A is one of several alternatives developed by the Forest Service to protect and enhance the Chattooga's values.

with law. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Judicial review of agency action is highly deferential and begins with a presumption of validity. *See Natural Res. Def. Council v. EPA,* 16 F.3d 1395, 1400 (4th Cir.1993). "Especially in matters involving not just simple findings of fact but complex predictions based on special expertise, 'a reviewing court must generally be at its most deferential.'" *Ohio Valley Envtl. Coal.,* 556 F.3d at 192 (*quoting Baltimore Gas & Elec. Co. v. Natural Res. Def. Council,* 462 U.S. 87, 103, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983)). The court must limit its review of an agency's action to the facts contained in the administrative record. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins., Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

"In determining whether agency action was arbitrary and capricious, the court must consider whether the agency considered the relevant factors and whether a clear error of judgment was made." *Ohio Valley Envtl. Coal.,* 556 F.3d at 192 (*citing Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814). The scope of review under the APA is narrow, however, "the court must nonetheless engage in a 'searching and careful' inquiry of the record." *Ohio Valley Envtl. Coal.,* 556 F.3d at 192 (internal citation omitted). The court is not empowered to substitute its judgment for that of the agency. *Citizens to Preserve Overton Park, Inc.,* 401 U.S. at 416, 91 S.Ct. 814. "Deference is due where the agency has examined the relevant data and provided an explanation of its decision that includes 'a rational connection between the facts found and the choice made.'" *Ohio Valley Envtl. Coal.,* 556 F.3d at 192 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins., Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443

(1983)) (internal quotations and citations omitted). Moreover, "'[a]gencies are entitled to select their own methodology as long as that methodology is reasonable,' and [the court] must defer to such agency choices." *Id.* at 201 (*quoting Hughes River Watershed Conservancy v. Johnson,* 165 F.3d 283, 289 (4th Cir.1999)). Nonetheless, the court will vacate an agency's decision if it has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view of the product of agency expertise. *Nat'l Ass'n of Home Builders v. Defenders of Wildlife,* 551 U.S. 644, 658, 127 S.Ct. 2518, 168 L.Ed.2d 467 (2007).

### DISCUSSION

American Whitewater, the Rust Family, and Georgia ForestWatch each contest the Forest Service's management decisions concerning the 2012 Plan and the matter is now before the court by way of motions for Judgment on the Administrative Record. Specifically, American Whitewater sets forth challenges under the APA, WSRA, NEPA, MUSYA, NFMA, and Wilderness Act, and further argues that the Forest Service violated its manuals and procedures. (ECF No. 233). American Whitewater also contends that the Forest Service's conduct violates their Due Process and Equal Protection rights under the Fifth Amendment of the United States Constitution. The Rust Family challenges the 2012 Plan under the WSRA and NEPA. (ECF No. 232). Georgia ForestWatch challenges the Forest Service's 2012 Plan under the WSRA, Wilderness Act, NFMA, NEPA, and regulations limiting potential permit locations (36 C.F.R. § 261.77). (ECF No. 231). As noted

above, Georgia ForestWatch is a limited intervenor in this matter and has no claims pending in this action. Georgia Forest-Watch, however, filed a motion for summary judgment seeking: to enjoin the implementation of certain portions of the 2012 Plan authorizing boating, remand of the matter to the Forest Service for further study and analysis, and a finding that the Forest Service failed to satisfy certain statutory and regulatory obligations. The court struck Georgia ForestWatch's prayer for relief as beyond the scope of its intervenor status. (ECF No. 254). Thus, although the court has considered Georgia ForestWatch's arguments and will discuss them herein, the court limits its findings to the parties with claims pending in this case.

## 1. WILD AND SCENIC RIVERS ACT

Congress enacted the WSRA, codified at 16 U.S.C. § 1271 *et seq.*, in 1968 to help protect rivers of the United States from over development and damming. *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1027 (9th Cir.2008). The WSRA's opening section indicates:

> [T]hat certain selected rivers ... which, with their immediate environments, possess outstandingly remarkable scenic, recreational, geologic, fish and wildlife, historic, cultural, or other similar values, shall be preserved in free-flowing condition, and that they and their immediate environments shall be protected for the benefit and enjoyment of present and future generations.

16 U.S.C. § 1271; *Friends of Yosemite Valley*, 520 F.3d at 1027. Rivers designated as wild, scenic, or recreational must "possess one or more of the values" referred to in § 1271. *Wilderness Watch v. U.S. Forest Service*, 143 F.Supp.2d 1186, 1190 (D.Mont.2000). The WSRA, requires the administering agency to manage each designated river segment "in such manner as to protect and enhance the values which

caused it to be included in said system without, insofar as is consistent therewith, limiting other uses that do not substantially interfere with public use and enjoyment of these values." 16 U.S.C. § 1281(a); *Hells Canyon Alliance v. U.S. Forest Serv.*, 227 F.3d 1170, 1177–78 (9th Cir. 2000). The administering agency must also manage each segment of the river to protect its esthetic, scenic, historic, archeologic, and scientific features. 16 U.S.C. § 1281(a). Under the WSRA, administering agencies are also required to prepare a Comprehensive Management Plan ("CMP") that addresses "resource protection, development of lands and facilities, user capacities, and other management practices necessary or desirable to achieve the purposes of [the WSRA]." 16 U.S.C. § 1274(d).

■ American Whitewater sets forth three arguments in support of its contention that the Forest Service's 2012 Plan violates the WSRA. First, American Whitewater argues that whitewater floating is an Outstanding Remarkable Value ("ORV") and a value that caused the Chattooga to be included in the WSRA and, as such, federal law requires the Forest Service to protect and enhance whitewater floating. Second, American Whitewater contends that, even if floating is not an ORV, it is a use that cannot be limited unless it substantially interferes with an ORV. American Whitewater's third argument is that the Forest Service's 2012 Plan is contrary to law due to the Forest Service's failure to conduct a legally sufficient user capacity study. In conjunction with this argument, American Whitewater contends that even if the Forest Service's user capacity study was not contrary to law, the Forest Service failed to manage the Headwaters in accordance with the user capacity study and this management failure was arbitrary, capricious and an abuse of discretion. (ECF No. 233–1 at 28). The

court addresses each of these arguments below.

### i. ORVs Must be Protected and Enhanced

Under the WSRA, the Forest Service must manage the Chattooga as follows:

Each component of the national wild and scenic rivers system shall be administered in such manner as to protect and enhance the values which caused it to be included in said system without, insofar as is consistent therewith, limiting other uses that do not substantially interfere with public use and enjoyment of these values.

16 U.S.C. § 1281(a).

American Whitewater contends that whitewater floating is one of the ORVs of the Chattooga and one of the values that caused the Headwaters to be included in the WSRS. Thus, American Whitewater further contends whitewater floating must be "protected and enhanced." American Whitewater argues that restrictions contained in the 2012 Plan do not protect and enhance whitewater floating. (ECF No. 233–1 at 14). In support of its contention that floating is an ORV of the Chattooga, American Whitewater relies upon this court's earlier determination that whitewater floating is an ORV of the Chattooga, and argues that such is now the law of the case. *See Am. Whitewater v. Tidwell*, No. 8:09–cv–02665, 2010 WL 5019879 (D.S.C. Dec. 2, 2010) (ECF No. 95 at 21). American Whitewater further asserts that the administrative record "overwhelmingly shows" that whitewater floating is one of the Chattooga's ORVs and one of the values that caused the Chattooga to be included as one of the first rivers to be protected under the WSRA. (ECF No. 233–1 at 14). The Forest Service, the Rust Family and Georgia ForestWatch all dispute American Whitewater's contention

that whitewater floating is an ORV of the Chattooga.

The Forest Service argues that this court is not bound by its earlier finding that floating is an ORV. The Forest Service also argues that the administrative record does not support American Whitewater's contention that whitewater floating is an ORV of the Chattooga. The court agrees. The December 2, 2010, order upon which American Whitewater relies was responsive to a motion for a preliminary injunction (ECF No. 15) and was entered prior to the filing of the administrative record in this case. (ECF No. 95 at 18–26). Therefore, it is neither the law of the case nor binding upon this court. *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981) ("the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits."). Now that the court has the benefit of the underlying record, the court is within its bounds to revisit the issue and discerns that its previous indication that "floating is one of the ORVs of the Chattooga" (ECF No. 95 at 21) was in error. *City of Charleston, S.C. v. Hotels.com, LP*, 520 F.Supp.2d 757, 774 (D.S.C.2007).

In support for its contention that the administrative record overwhelmingly supports a finding that whitewater floating is an ORV of the Chattooga, American Whitewater points to two items—a limited excerpt from the 1971 Study and cover art of reports prepared in connection with the 1971 Study. The excerpt from the 1971 Study reads as follows:

. . . .

a river with sufficient volume and flow to allow full enjoyment of river-related **recreation activities.** These activities **like fishing, whitewater canoeing and hiking and camping** along the river will

enhance the recreation opportunities for many people where river-oriented recreation is scarce.

. . .

a river capable of supplying many intangible values. These values are difficult to assess but certainly exist for the canoeist as he meets the challenge of the river, **the scientist as he studies the natural phenomena of the river, and the nature photographer filming the beauty of the river.**

AR001:00068–69 (emphasis added).

A fair reading of this section of the 1971 Study indicates, contrary to American Whitewater's arguments, that recreation, not whitewater floating, is the protected ORV and that fishing, whitewater canoeing, hiking, and camping are all different types of recreation that can take place on the river. This conclusion is supported by the 1996 ORV Report prepared by the Forest Service which clearly identifies the five ORVs of the Chattooga as history, geology, biology, scenery, and recreation. (ECF No. 230 at 18 & AR001:00009). Further support is found in the language of Section 1271 itself. When Congress enacted the WSRA it declared that:

[C]ertain selected rivers of the Nation which, with their immediate environments, possess outstandingly remarkable scenic, **recreational,** geologic, fish and wildlife, historic, cultural, or other similar **values,** shall be preserved in free-flowing condition, and that they and their immediate environments shall be protected for the benefit and enjoyment of present and future generations. The Congress declares that the established national policy of dam and other construction at appropriate sections of the rivers of the United States needs to be complemented by a policy that would preserve other selected rivers or sections thereof in their free-flowing condition to protect the water quality of such

rivers and to fulfill other vital national conservation purposes.

16 U.S.C. § 1271. (emphasis added).

American Whitewater also asserts that the cover art from three Forest Service's Reports prepared prior to the 1971 Study illustrates that whitewater floating is an ORV of the Chattooga. The Forest Service disagrees with this assertion as does the court. While the cover of each report does have a picture of a boater, the text of the reports points to boating as one of many types of recreation. (AR001:00001; AR333:13408; AR334–13440).

The court has carefully considered the arguments presented, and after review of the applicable law and the administrative record, concludes that floating is not an ORV of the Chattooga and is therefore, not entitled to the "protect and enhance" status conferred by the WSRA. Therefore, the court need not address the issue of whether the restrictions in the 2012 Plan "protect and enhance" whitewater floating.

*ii. The 2012 Plan Supports the Forest Services's Determination that Floating Substantially Interferes with Other Values*

Pursuant to 16 U.S.C. § 1281 of the WSRA, "each component of the national wild and scenic rivers system shall be administered in such manner as to protect and enhance the values which caused it to be included in said system without, insofar as is consistent therewith, limiting other uses that do not substantially interfere with public use and enjoyment of these values." 16 U.S.C. § 1281(a).

American Whitewater argues that the record contains no evidence that floating substantially interferes with remarkable values of the Headwaters. (ECF No. 233–1 at 19). American Whitewater asserts that "actual" substantial interference is required to support a limit on whitewater

floating and argues that the Forest Service has referenced only potential conflicts between whitewater floating and other recreation uses. (ECF No. 233–1 at 20). American Whitewater cites *Riverhawks v. Zepeda*, 228 F.Supp.2d 1173, 1185 (D.Or. 2002) and the Forest Services's Reviewing Officer's 2005 decision on American Whitewater's 2004 administrative appeal, in support of this assertion. (ECF No. 240 at 14).

The Forest Service disputes American Whitewater's assertion that the record contains no evidence that floating substantially interferes with remarkable values of the Headwaters. The Forest Service also disputes American Whitewater's assertion that it must show "actual" substantial interference before restrictions can be placed on whitewater floating and contends that American Whitewater has no provided no authority, other than its own assertion for this position. The Forest Service contends that neither the *Riverhawks* case nor the 2005 Forest Service's Reviewing Officer's decision adds any support to American Whitewater's contention that "actual" substantial interference is required. Additionally, the Forest Service asserts that the EA supports its determination that whitewater floating should be limited in order to avoid substantial interference with other recreation uses and other ORVs of the Chattooga.

Contrary to American Whitewater's assertion, the administrative record contains evidence of conflict between other recreation uses and other ORVs. The EA

reflects that as early as 1976, there is documented evidence of conflict between fishermen and boaters. Citing the Federal Register, the EA states that "[c]onflicts have developed on certain sections of the river where floaters and fishermen use the same waters . . ." (AR 400:16758). The agency carefully considered the type and extent of encounters between hikers, boaters, anglers, campers, and swimmers. (*See* AR171:20679–20747). The record, as it has developed since the 2005 decision, also contains examples of types of potential conflict between recreation groups, including social values conflict, face-to-face conflict, and limited tolerance. (AR 400:16779–16780). American Whitewater, however, appears to discount this evidence of potential conflicts, ignores the longstanding evidence of previous conflicts, and limits the term "actual" to only refer to incidents that have occurred in the past.[8] As to the *Riverhawks* case, it does not expressly use the term "actual substantial interference" and this court declines to read such a requirement into 16 U.S.C. § 1281. Of course the *Riverhawks* case, decided by a district court judge in Oregon, is respectfully not binding on this court. *See Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996). More importantly, however, *Riverhawks* actually illustrates the deference afforded to the Forest Service's determination concerning what constitutes substantial interference. *Riverhawks v. Zepeda*, 228 F.Supp.2d at 1185.

---

**8.** Under the APA, "[a]gencies are entitled to select their own methodology as long as that methodology is reasonable." *Hughes River Watershed Conservancy v. Johnson*, 165 F.3d 283, 289 (4th Cir.1999). "[A] reviewing court must remember that the [agency] is making **predictions**, within its area of special expertise, at the frontiers of science. When examining this kind of scientific determination, as opposed to simple findings of fact, a review-

ing court must generally be at its most deferential." *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 103, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983) (emphasis added); *see also West Virginia v. EPA*, 362 F.3d 861, 868 (D.C.Cir.2004) (An agency has "undoubted power to use predictive models as long as it explains the assumptions and methodology used.") (citation and internal quotations omitted).

The court notes that under the APA, the Forest Service's determinations about which uses are inconsistent with protecting and enhancing rivers values, and which uses "substantially interfere" with those values, "must be accorded substantial deference." *Id.* (*citing Hells Canyon v. U.S. Forest Serv.*, 227 F.3d 1170, 1178 (9th Cir. 2000)). The court must give deference to the Forest Service's decisions, especially when its decisions involve matters within the agency's expertise. *Id.* "[C]ourts are instructed to defer to the reasonable interpretations of expert agencies charged by Congress to fill any gap left, implicitly or explicitly, in the statutes they administer." *Nat'l Elec. Mfrs. Ass'n v. U.S. Dep't of Energy*, 654 F.3d 496, 504 (4th Cir.2011).

The 2005 decision was responsive to American Whitewater's 2004 administrative appeal and does not address the 2012 Plan challenged in this case and provides no support to American Whitewater's assertion regarding "actual" substantial interference. (AR404:17257 & AR400:16698).

After reviewing the administrative record and considering the arguments of counsel, the court concludes that there is sufficient evidence within the record to support the Forest Service's restrictions on whitewater floating to prevent it from substantially interfering with other components of the recreation ORV and other ORVs of the Chattooga.

*iii. User Capacity Study*

Under the WSRA, agencies are required to prepare a CMP to provide for the protection of the river values. 16 U.S.C. § 1274(d)(1). The CMP shall address "resource protection, development of lands and facilities, user capacities, and other management practices necessary or desirable to achieve the [WSRA] purposes." *Id.* Prior to the finalization of the 2012 Plan, the Forest Service prepared a CMP which addressed user capacity.

As set forth previously, the APA governs this court's review of claims brought pursuant to the WSRA and the court may set aside the agency's action only if the action was "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *N.C. Wildlife Fed'n v. N.C. Dep't of Transp.*, 677 F.3d 596, 601 (4th Cir.2012) (quoting 5 U.S.C. § 706(2)(A)).

American Whitewater argues that the Forest Service failed to prepare a user capacity study that is legally sufficient because it fails to address the "kinds and amounts of use" which the Headwaters can sustain. *See Friends of Yosemite Valley*, 520 F.3d at 1026. American Whitewater asserts that the user capacity analysis for the Headwaters suffers from the same flaw that the Ninth Circuit found with the Merced River user capacity study in *Friends of Yosemite Valley*, that is, an absence of "quantitative measures sufficient to ensure its effectiveness as a current measure of user capacities." *Id.* at 1030.

The Forest Service agrees with American Whitewater that Section 1274(d) of the WSRA required it to prepare a legally sufficient user capacity study and the Forest Service maintains that it has done so. At the outset, the Forest Service urges the court to adopt the plain meaning of the phrase "address ... user capacities" from Section 1274(d) as set forth by the Ninth Circuit. The court in *Friends of Yosemite Valley*, 520 F.3d at 1029, indicated that "the plain meaning of the phrase 'address ... user capacities' is simply that the CMP must deal with or discuss the maximum number of people that can be received at a WSRS." In addition, the court noted that "the plain meaning does not mandate 'one particular approach to visitor

capacity.'" *Friends of Yosemite Valley,* 520 F.3d at 1029.

The Forest Service asserts that its user capacity study does deal with and discuss the maximum number of people that can be received at the Headwaters and notes once more that the plain meaning of Section 1274(d) does not mandate one particular approach for the analysis of user capacity. *Friends of Yosemite Valley,* 520 F.3d at 1029. The court agrees.

Here, the Forest Service used both quantitative and qualitative measures to evaluate user capacities. The Forest Service included a limits of acceptable change ("LAC") process and numeric-focused capacity processes in its user capacity analysis for the Chattooga WSR. (AR400:16763–64). The Forest Service points out that "[b]oth ... processes have the same goal: protect river values by ensuring impacts do not exceed unacceptable levels." *Id.*

Although the court does not read *Friends of Yosemite Valley* as broadly as urged by American Whitewater, that is that every user capacity study must address "kinds and amounts of use" exactly as the court required in that case, the Forest Service's Study did, in fact, do just that. The EA prepared by the Forest Service here explicitly recognizes and addresses *Friends of Yosemite Valley* in its user capacity analysis for the Chattooga. (AR400:16763–64). Not only did the Forest Service address *Friends of Yosemite Valley* and the need for numeric capacities it also detailed its methodology for developing the sort of process that addresses "capacity," defined as "the **amount and type of use** that protect and enhances river values" which is what *Friends of Yosemite Valley* required. (AR400:16764) (emphasis added). More specifically, the Forest Service considered several important indicators, use-impact relationships, use information, administrative concerns, and multiple sources of data, calculations,

and other information to analyze visitor use capacities. (AR400:16764). The Forest Service addressed and analyzed user capacity through the "Upper Chattooga River Visitor Capacity Analysis Plan" which sets forth the planning framework to address visitor capacity issues. (AR155:20797–98; see also AR171:20679–84). That framework was used to develop the EA which integrates the Forest Service's findings on visitor capacity which were amassed through: use estimation workshops (agency experts reviewed available information and their professional observations to develop consensus use estimates); vehicle count-based estimation; general relationships between use levels and impacts; and logic-based calculations associating vehicle counts at access sites with current peak-use levels to develop future parking projections. (AR400:16764; AR400:16768–70). Additionally, the EA contains discussion, analysis, and data tables outlining capacities and existing and projected use patterns for front and backcountry areas for the selected Alternative 13A. (AR400:16827; AR400:16829). Importantly, the user capacity study in this case established guidelines for the number and size of groups that could be received at one time and the number of people that could be received at one time in frontcountry and backcountry reaches. (*See, e.g.,* AR402:172). The court concludes that these efforts comply with the statutory directives.

American Whitewater also argues that the Forest Service's user capacity study does not follow the USDA's own guidelines which require that "[s]tudies will be made during preparation of the management plan and periodically thereafter to determine the quantity and mixture of recreation and other public use which can be permitted without adverse impact on the resource values of the river area." (ECF No. 233–1 at 25). The Forest Service

responds that its procedures are not substantive in nature and do not have the independent force and effect of law. Here, even if American Whitewater could establish that the Forest Service had failed to comply with its guidelines, any non-compliance would not be a violation of law. Upon review, the court finds that the Forest Service's consideration of user capacity satisfied the WSRA and was neither arbitrary nor capricious.

Next the court will address the Rust Family's claims that the 2012 Plan violates the WSRA. In its response to the second amended complaint, the Rust Family has asserted crossclaims challenging the 2012 Plan. (ECF No. 225). To summarize, the Rust Family argues that the 2012 Plan violates the WSRA because the Forest Service: · 1) failed to properly document and consider landownership in the process of planning and administering the WSR Corridor as well as the possible impacts of its actions on the Rust Family's property interests; and 2) improperly emphasized recreation over other uses, including landowner uses, in violation of the WSRA's non-degradation and enhancement policy.

To address the Rust Family's first argument, the court notes that the WSRA requires the Secretary of the Department of Agriculture to "study and submit to the President reports on the suitability or non-suitability for addition to the [NWSRS] of rivers which are designated herein or hereafter by the Congress as potential additions to such system." 16 U.S.C. § 1275(a). The report "shall show among other things . . . the current status of land ownership and use in the area." *Id.* Consistent with 16 U.S.C. § 1275(a), the 2012 Plan identifies the property interests and current land ownership status in the Chattooga WSR corridor. The WSRA requires

nothing more. The Rust Family also asserts that the 2012 Plan failed to consider the impacts of its action on the Rust property, specifically those of boating type activities on their property. The court disagrees. The administrative record reflects that the 2012 Plan neither allows nor suggests boating-type activities on the Rust Property. The EA and the Forest Services' decisions on the Rusts' administrative appeal clarify that the 2012 Plan documents do not authorize boating on the Rust Family property [9]. (AR 400:16709).

Secondly, the Rust Family contends that the Forest Service's 2012 Plan violates the WSRA because the decisions place primary emphasis on recreation and thus violate the WSRA's non-degradation and enhancement policy. (ECF No. 232–1 at 26–27). Specifically, the Rust Family argues that protection of any recreational activity, such as boating, cannot be a primary emphasis of administration of the Chattooga and maintains that the 2012 Plan places an improper emphasis on boating, one particular type of recreation on public lands. (ECF No. 232–1 at 26). The Rust Family argues that the administrative record demonstrates that boating, and other recreational uses are damaging to the conservation efforts of the WSRA and also cause damage and degradation to the Chattooga WSR corridor. (ECF No. 232–1 at 26). The Forest Service maintains that the 2012 Plan achieves an appropriate balance of the Chattooga's values, including recreation and does not elevate one value over any of the others to include the river's free flowing condition, ORVs, and water quality. (ECF No. 238 at 38). The court agrees with the Forest Service's position; a review of the 2012 Plan makes clear that it achieves an appropriate balance of the

---

9. The Forest Service concurs it has no authority over private lands for recreational management. (AR536:26231).

Chattooga's values, including recreation, and the Plan does not elevate one value over any of the others. The 2012 Plan also protects the Chattooga's free-flowing condition and water quality in accordance with the WSRA.

To this point, the court notes that the EA carefully explores and discusses each of the Chattooga's ORVs to include history, geology, biology, scenery, and recreation. (AR400:16757–16955) and discusses the impact of each alternative on each of the ORVs. The selected alternative (Alternative 13A) protects and enhances all five ORVs and thus complies with the nondegradation and enhancement policy. There is no evidence in the record to support the Rust Family's claim that recreation is elevated above the other ORVs, particularly in view of the selected alternative. The Rust Family cites to a portion of the EA performed in connection with the 2012 Plan as evidence that trails for recreational use, including boating, have caused damage and degradation to the Chattooga WSR corridor, especially in riparian zones and tributaries (AR400:16698), but this portion of the EA sets forth the "Purpose and Need for Action" and only acknowledges that the Forest Service is seeking (through the 2012 Plan) to take appropriate actions to reduce negative impacts to the river's values and to preserve its free-flowing condition, water quality, and to protect and enhance the river's ORVs. Further, the Forest Service specifically did not choose an alternative that would allow boating in tributaries above Highway 28 (AR400:16741) precisely because it was concerned about debris, vegetation, increased encounter levels, and other issues. Thus, the Rust Family's citation to this portion of the record as evidence of environmental degradation does not support its argument. (ECF No. 232–1 at 27). As set forth by the Interagency Wild and Scenic Rivers Coordinating Council and recorded in the EA, "nondegradation in

the context of a wild and scenic river is assurance that there is no downward trend in conditions that affect ORVs." (AR400:16712). The court finds no such downward trend here.

Additionally, the EA fully details other river values including free-flowing condition and water quality. The EA specifically notes that "as required by the WSRA, at the time of designation, the Chattooga River was flowing in its natural condition without impoundment from Cashiers Lake south to Tugaloo Lake." (AR400:16956). The EA then notes that there are currently no impacts to the natural flows of the Chattooga for its entire length and that none of the alternatives would impact this free-flowing condition of the Chattooga. (AR400:16956). In sum, the 2012 Plan does not propose any water resource projects or alternatives that would impact the free-flowing conditions of the Chattooga WSR. (AR400:16956). The EA also fully discusses the alternatives and their impact on water quality. (AR400:16957–16964). The Forest Service conducted extensive analysis on sediment, water pollutants, and other potential detriments to water quality. (AR400:16959–16963). The Forest Service concluded that the water quality of the Chattooga would continue to meet state water quality standards and concluded that foreseeable activities would continue to protect the water quality of the Chattooga WSR. (AR400:16964).

The court has carefully considered the Rust Family's arguments in light of the record and the applicable law. On the whole, the 2012 Plan protects and enhances the Chattooga WSR's free-flowing condition, ORVs, and water quality in accordance with the WSRA. The 2012 Plan achieves an appropriate balance of the Chattooga's values, including recreation, and does not elevate one value over any of the others and therefore complies with the

non-degradation and enhancement policy. The court finds the Forest Service's 2012 Plan complies with 16 U.S.C. § 1275 of the WSRA and is neither arbitrary nor capricious. To the extent, the Rust Family suggests the Forest Service has violated the WSRA or any other federal law by clouding its title, engaging in a taking of its private property interests, abrogated the Rust Family's right to access their private property above Green Creek, or seeks to resolve the issue of the navigability of the riverbed flowing through the Rust Family property, these claims are not ripe for judicial review. Therefore, the Rust Family's crossclaims are dismissed without prejudice.

### 2. NATIONAL ENVIRONMENTAL POLICY ACT

▮▮▮▮▮ The National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370h, "declares a national policy of protecting and promoting environmental quality" and therefore "requires federal agencies to follow certain procedures before undertaking projects that will affect the environment." *Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437, 443 (4th Cir.1996). NEPA is designed "to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." 42 U.S.C. § 4321. The Fourth Circuit has noted that "the purpose of NEPA is to sensitize all federal agencies to the environment in order to foster precious resource preservation." *Nat'l Audubon Soc'y v. Dep't of the Navy*, 422 F.3d 174, 184 (4th Cir.2005) (citing *Andrus v. Sierra Club*, 442 U.S. 347, 350–51, 99 S.Ct. 2335, 60 L.Ed.2d 943 (1979); *Hodges v. Abraham*, 300 F.3d 432, 438 (4th Cir.2002)). In accordance with its fundamental purpose, NEPA: 1) ensures that a federal agency will carefully consider the effects of its actions on the environment by specifying formal procedures the agency must follow before taking action; and 2) requires an agency to broadly disseminate its findings on the environmental impacts of its actions. *Id.* at 184. "NEPA imposes only procedural requirements on federal agencies with a particular focus on requiring agencies to undertake analyses of the environmental impact of their proposals and actions." *U.S. Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 757, 124 S.Ct. 2204, 159 L.Ed.2d 60 (2004). In reviewing an agency's efforts to ensure compliance with NEPA, the court is tasked to ensure that the agency took a "hard look" at the environmental consequences of the proposed action. *Webster v. U.S. Dep't of Agriculture*, 685 F.3d 411 (4th Cir.2012); *see also Nat'l Audubon Soc'y*, 422 F.3d at 185; *Strycker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 227–28, 100 S.Ct. 497, 62 L.Ed.2d 433 (1980) (per curiam) (noting that the agency considered the environmental consequences of its decision and that "NEPA requires no more"). "What constitutes a 'hard look' cannot be outlined with rule-like precision." *Nat'l Audubon Soc'y*, 422 F.3d at 185. A hard look does encompass a "thorough investigation into the environmental impacts of an agency's action and a candid acknowledgment of the risks that those impacts entail." *Id.* The court, however, may not "use review of an agency's environmental analysis as a guise for second-guessing substantive decisions committed to the discretion of the agency" or simply "rubber stamp" the decision. *Id.; see also id.* at 186 ("Courts may not 'flyspeck' an agency's environmental analysis, looking for any deficiency, no matter how minor.") In conducting a NEPA inquiry, the court must make a careful inquiry into the facts and review whether the decision was based on consideration of the relevant factors and whether there was a clear error in judgment. *Id.* The review " 'requires a pragmatic judgment whether the

[Environmental Impact Statement's] form, content [,] and preparation foster both informed decision-making and informed public participation.'" *Webster*, 685 F.3d at 421 (internal citation omitted). A court reviewing an EIS for NEPA compliance must "take a holistic view of what the agency has done to assess environmental impact." *Nat'l Audubon Soc'y*, 422 F.3d at 186.

Additionally, it must be noted that because the APA governs this court's review of claims brought pursuant to NEPA, the reviewing court may set aside the agency's action only if the action was "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *N.C. Wildlife Fed'n*, 677 F.3d at 601 (quoting 5 U.S.C. § 706(2)(A)). This involves a searching and careful review of the agency's actions, but is ultimately narrow and very deferential. *Id.; see also Ohio Valley Envtl. Coal.*, 556 F.3d at 192. Ultimately, "[i]f the agency has followed the proper procedures, and if there is a rational basis for its decision, we will not disturb its judgment." *Hodges*, 300 F.3d at 445.

With these standards in mind, this court turns to a review of the Forest Service's action and the arguments set forth by the parties concerning the same. American Whitewater contends that the Forest Service's actions have violated NEPA in the "decision to restrict and prohibit the protected whitewater floating value in the Headwaters ... because there is no demonstrated scientific basis for refusing to restore the whitewater floating value on the Chattooga." (ECF No. 233-1 at 23). American Whitewater further contends that whitewater boating causes no resource impacts and that the Forest Service has not "identified the methodologies used or made explicit the scientific sources justifying the Forest Service's continued refusal to protect and enhance floating on the Headwaters." (ECF No. 233-1 at 24).

American Whitewater argues that the 26,-000 page record, although voluminous, does not offer justification for the Forest Service's failure to "address, incorporate or respond in any way to the volumes of scientific data American Whitewater presented to them, which universally support immediate protection and enhancement of the whitewater floating value on the Headwaters." (ECF No. 233-1 at 24). American Whitewater contends that the record only discusses potential conflicts and estimated uses, and otherwise lacks documentation of any impact of paddling on the Headwaters or similar regional streams. (ECF No. 233-1 at 23-25).

Georgia ForestWatch argues that the Forest Service has violated NEPA, not by limiting boating on the Headwaters, but instead, by failing to conduct legally mandated studies and analyses. (ECF No. 231-1 at 29-30). Georgia ForestWatch claims that the Forest Service's 2012 Plan, "a reversal of decades of a contrary policy" violates NEPA's "protect and promote environmental quality goal" in its failure to fully discuss the environmental impacts of the action and the alternatives. (ECF No. 231-1 at 30-31). Thus, Georgia ForestWatch argues that the Forest Service should be required to "perform a legally-sufficient visitor capacity study and to fully consider all elements of its decision, including impacts of interim access for boaters." (ECF No. 231-1 at 32). The Rust Family focuses on the public dissemination and disclosure aspects of NEPA and notes that NEPA also requires agencies to document the potential effects of a proposed policy on the environment. (ECF No. 232-1 at 23). Accordingly, the Rust Family argues that the Forest Service violated NEPA by: 1) withholding required assessments from Plan amendments; and 2) failing to assess the impact of trails to accommodate the 2012 Plan before decisions were made in

light of their property rights. (ECF No. 232–1 at 22–26).

The Forest Service reasons that its 2012 Plan does comply with NEPA and maintains that the record supports the need for some restrictions on whitewater floating (i.e., capacity report (AR171:20741–47), hydrology report (AR166:03169–71) and several other reports). (ECF No. 230 at 34). The Forest Service argues that, contrary to American Whitewater's claims, NEPA does not require that a user capacity study outline specific substantive results. (ECF No. 230 at 34). Thus, the agency argues that its analysis addressing user capacities and existing use patterns satisfied its obligations under NEPA. (ECF No. 230 at 34–35). The Forest Service further argues that the 2012 Plan also appropriately considered the impacts to private property interests in that the EA and the Amendments do not authorize boating on Rust Family property. (ECF No. 230 at 35). In consideration of the Rust Family's private property, the Forest Service did not exhaustively evaluate alternatives that would allow for boating through private land. (ECF No. 230 at 36). The Forest Service argues that it fully assessed the reasonably foreseeable environmental impacts of proposed actions. (ECF No. 230 at 37–38).

The court has carefully considered the parties' arguments in light of the record and the applicable law. Upon careful consideration, the court finds that the Forest Service's 2012 Plan complies with the directives and provisions of NEPA. This case illustrates precisely why the Forest Service's decisions are entitled to deference, as it had to carefully balance the wide-ranging interests advocated by the several parties and participants in this lawsuit as well as those not listed in the case caption. "As long as the adverse environmental effects of a proposed action are sufficiently identified and evaluated, an agency is vested with discretion to determine under NEPA that other values outweigh the environmental costs." *See Johnson*, 165 F.3d at 289. The voluminous record supports the Forest Service's contention that it satisfied its obligations under NEPA of taking a "hard look" in its quest to balance recreational benefits and environmental consequences.

For instance, the agency carefully considered capacity issues and the type and extent of encounters between hikers, boaters, anglers, campers, and swimmers. (*See* AR171:20679–20747). The Forest Service also conducted a hydrology report that assesses the steamflow character of the Headwaters and a report assessing the number of boatable days on the Headwaters. (*See* AR166:03169–71; AR211:09472–88). Ultimately, the Forest Service reached a decision to allow for several days of whitewater boating opportunities while minimizing the potential for conflict. (*See* AR400:16824–30); *see also* 42 U.S.C. § 4332(A) ("all agencies of the Federal Government shall utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decision-making which may have an impact on man's environment"). Contrary to American Whitewater's assertion, these studies and other record evidence demonstrate a sound scientific basis for the restrictions imposed by the 2012 Plan. It is simply not clear what further efforts American Whitewater believes the Forest Service should have taken here.

"Agencies are entitled to select their own methodology as long as that methodology is reasonable," thus any challenges to the method, approach, and scope of the Forest Service's review as required by NEPA is unwarranted. *See Johnson*, 165 F.3d at 289. The reviewing court must

give deference to the agency's decision. *Id.* American Whitewater argues that the Forest Service has not set forth a sufficient scientific basis and data for its decision but it is apparent that American Whitewater is seeking to impose obligations and requirements on the Forest Service that are simply not required by NEPA's statutory text and regulations. "NEPA does not demand that every federal decision be verified by reduction to mathematical absolutes for insertion into a precise formula." *Sierra Club v. Lynn,* 502 F.2d 43 (5th Cir.1974); *see also Johnson,* 165 F.3d at 290 (citing *Sierra Club v. Lynn,* 502 F.2d 43 (5th Cir.1974)).

Upon review, the court concludes that the Forest Service has also satisfied its obligations to consider and document potential impacts of particular concern to the Rust Family. (*See* AR 400:16706–9; AR430: 18924–25; AR171:20703; AR171:20723–29); *see Webster,* 685 F.3d at 429 (under NEPA an agency is not required to analyze environmental consequences or alternatives it has rejected in good faith as too remote, speculative, impractical or ineffective); *Hodges,* 300 F.3d at 438 (finding that once proper NEPA procedures are completed, i.e., identifying and evaluating the adverse effects of the proposed action, the agency is entitled to decide that other values outweigh the environmental costs). The Rust Family appears to argue that while the EA acknowledged that permitting boating from Green Creek may increase the chances of boater trespass on private lands, the Forest Service failed to consider this negative impact prior to amending the recreational policy. (ECF No. 232–1 at 23). The Rust Family argues that the Forest Service was required to consider and document the potential negative effects of trespass, in light of the Rust Family's property interests, prior to implementing the EA and Amendments. (ECF No. 232–1 at 23–24). As a second point concerning NEPA, the Rust

Family argues that the Forest Service failed to assess the impact of trails, particularly their locations in light of the expansion of recreational use, prior to implementing the 2012 Plan. (ECF No. 231–1 at 24).

As noted above, the Court finds that the Forest Service fulfilled its obligation under NEPA to consider, evaluate, and document the potential impacts of concern to the Rust Family to include the potential for trespass by boating or over the Rust Family's land. Importantly, the 2012 Plan does not authorize boating above Green Creek, the location of the Rust Family property. (*See supra* text accompanying note 9). The Forest Service explained that it does not encourage trespass on private lands and that boating alternatives under consideration only focused on downstream use of Green Creek. (AR 400:16709). Even still, the Forest Service acknowledged that it did in fact consider these issues and provided reasons for its position. (AR 400:16741). Thus, there is no basis for the Rust Family's challenge in this regard.

 Similarly, the threat of trespass over Rust Family lands is also speculative given that the 2012 Plan only permits boating below the confluence of Green Creek and allows boaters to put-in at approved access areas. (AR404:17252–54; AR404:17261–62). "[A]gencies must take into account effects that are reasonably foreseeable, [but] they generally need not do so with effects that are merely speculative." *Webster,* 685 F.3d at 429. Finally, there is no basis in the record for the Rust Family's NEPA claim concerning failure to assess the impact of trails because the 2012 Plan does in fact properly explore and document the overall impact of this user-created feature. (AR171:20723–29). Even the existence of some adverse impacts to the Chattooga WSR corridor be-

cause of existing trails does not mean that the Forest Service violated NEPA. NEPA sets forth policies and procedures, but it does not "mandate that agencies reach particular substantive results." *Glickman*, 81 F.3d at 443. Of course, the Rust Family is free to challenge any decisions on any site-specific locations of boating access points (made downstream from the Rust Family property) when those decisions are made and the issues are ripe for review. The issues are not ripe now, and the Forest Service was not required to exhaust every possible and tangential event that could potentially impact the local environment before authorizing boating in the manner set forth in the 2012 Plan. *See Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1053 (9th Cir.2012)(setting forth that under NEPA, the purpose of an EA is to create a workable public document that briefly provides evidence and analysis for an agency's finding regarding an environmental impact, rather than an exhaustive compilation of each and every tangential event that could potentially impact the local environment).

Accordingly, the Court rejects the Rust Family's challenges under NEPA and finds that the Forest Service is entitled to judgment on these claims as well. The agency complied with NEPA's "hard look" directives and judgment is granted in favor of the Forest Service on the parties' NEPA claims.

### 3. MULTIPLE–USE SUSTAINED YIELD ACT

The Multiple–Use Sustained–Yield Act of 1960 ("MUSYA"), 16 U.S.C. §§ 528–531, establishes that the national forests are established for the additional purposes of "outdoor recreation, range, timber, watershed, and wildlife and fish purposes." 16 U.S.C. § 528. The purpose of the MUSYA provisions is to be supplemental to the provision of the Organic Administration Act of 1897 establishing the purposes for which national forests were established. *Id.; United States v. New Mexico*, 438 U.S. 696, 714, 98 S.Ct. 3012, 57 L.Ed.2d 1052 (1978). MUSYA directs the USDA to "administer all forests, including those previously established, on a multiple-use and sustained yield basis" with the intention of "broaden[ing] the benefits accruing from all reserved national forests." *United States v. New Mexico*, 438 U.S. at 714, 98 S.Ct. 3012.

American Whitewater argues that MUSYA requires the Forest Service to provide for recreation opportunities in areas amenable to recreational uses and that it must "protect and enhance white water boating" in order to fulfill their MUSYA recreation obligations. (ECF No. 233–1 at 22). Without citing any case law or pointing to and explaining any facts in the record, American Whitewater contends that the Forest Service is not properly administering the Headwaters for recreational uses as required by MUSYA because the Forest Service fails to apply the correct standard and value to Headwaters floating. (ECF No. 233–1 at 22).

The court disagrees and finds that American Whitewater fails to state a claim under MUSYA. MUSYA authorizes and directs the USDA to "develop and administer the renewable surface resources of the national forests for multiple use and sustained yield of the several products and services obtained therefrom," not just whitewater floating and boating. 16 U.S.C. § 529. "Multiple use" means "the management of all the various renewable surface resources of the national forests so that they are utilized in the combination that will best meet the needs of the American people ..." 16 U.S.C. § 531. Thus, the Forest Service and its plans, must "make the most judicious use of the land for some or all of these resources or related services," including "outdoor recreation,

range, timber, watershed, wildlife and fish, and wilderness." 16 U.S.C. §§ 528, 531(a). Accordingly, MUSYA gives the Forest Service broad discretion to regulate the NFs for a wide variety of purposes. *See Wyoming v. U.S. Dept. of Agriculture,* 661 F.3d 1209, 1235 (10th Cir.2011); *see* 16 U.S.C. § 529 (requiring "due consideration" of "the relative values of the various resources"). American Whitewater fails to establish what it believes is the correct standard or value that must be assigned to Headwaters floating and its allegations ultimately fail to raise or articulate any claim under MUSYA concerning the 2012 Plan which in fact, do allow boating subject to reasonable restrictions.

### 4. NATIONAL FOREST MANAGEMENT ACT

The National Forest Management Act of 1976 ("NFMA") requires the USDA to "develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System." 16 U.S.C. § 1604(a). Under NFMA, the USDA must assure that NF plans "provide for multiple use and sustained yield of the products and services obtained therefrom in accordance with the Multiple–Use Sustained–Yield Act of 1960 (16 U.S.C.A. §§ 528–531), and, in particular, include coordination of outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness." 16 U.S.C. § 1604(e). American Whitewater argues that the Forest Service has not adequately provided for multiple uses of resources, particularly with respect to outdoor recreation. (ECF No. 233–1 at 23). Citing the record at AR404:17260 [10], American Whitewater argues that the Forest Service has not given "due consideration" to relative

values because "applying the Standard requires the whitewater boating value to be protected and enhanced, not banned." (ECF No. 233–1 at 23). The court has fully considered whether Defendants have satisfied their obligations under both the WSRA and MUSYA and American Whitewater asserts the same arguments here. For the reasons set forth above concerning the WSRA and MUSYA, Defendants are entitled to judgment as a matter of law.

### 5. WILDERNESS ACT

■ The Wilderness Act of 1964 established a National Wilderness Preservation system comprised of federally owned "wilderness areas" for the purpose of securing the "benefits of an enduring resource of wilderness" for the American people and future generations. 16 U.S.C. § 1131(a). Under the Act, wilderness is defined as "an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain." 16 U.S.C. § 1131(c). Wilderness areas are to be devoted to the "public purposes of recreational, scenic, scientific, educational, conservation, and historical use." 16 U.S.C. § 1133(b). The Wilderness Act is "simply a congressional acknowledgment of the necessity of preserving one factor of our natural environment from the progressive, destructive and hasty inroads of man, usually commercial in nature, and the enactment of a 'proceed slowly' order until it can be determined wherein the balance between proper multiple uses of the wilderness lies and the most desirable and highest use established for the present and future." *Parker v. U.S.,* 448 F.2d 793, 795 (10th Cir.1971). In administering a wilderness area, the Forest Service must find a balance between

---

**10.** American Whitewater's only citation is to the "Rationale for the Decision" portion of the Forest Service's Decision Notice and Finding of No Significant Impact amending the 2004 Revised Land and Resource Man-

agement Plan for the Sumter National Forest. (AR404:17260). Without more, it is unclear as to how this evidence supports American Whitewater's claim.

several competing interests and doing so requires the "application of judgment and discretion" on the part of the Forest Service. *Wilderness Watch v. U.S. Fish and Wildlife Serv.*, 629 F.3d 1024, 1033 (9th Cir.2010).

American Whitewater notes that the Headwaters flow through the Ellicott Rock Wilderness and therefore contends that portion of the headwaters is subject to the Wilderness Act. American Whitewater argues that the Forest Service has violated the Wilderness Act's requirement that wilderness be made available to the optimum extent where a "historical, low-impact form of primitive recreation is banned without any scientifically demonstrated impact on the wild resource or a legally-sufficient user capacity study." (ECF No. 233–1 at 21). In response, the Forest Service argues that the Wilderness Act does not create any specific mandates on whitewater floating, and only requires that the Forest Service provide opportunities for wilderness recreation more generally. (ECF No. 230 at 31). The Forest Service maintains it has broad discretion to manage the Ellicott Rock wildness area and properly exercised its discretion here. (ECF No. 238 at 27).

The court agrees and grants judgment in favor of the Forest Service on American Whitewater's Wilderness Act claim. The Wilderness Act focuses on the administration of wilderness areas for the use and enjoyment of the people and does not support the elevation of "recreational activity over the long-term preservation of the wilderness character of the land." *High Sierra Hikers Ass'n v. Blackwell,* 390 F.3d 630 (9th Cir.2004). To that end, the Forest Service has not banned whitewater floating altogether but instead has established limitations that allow for whitewater floating while addressing other environmental and recreational concerns and interests. The Forest Service has come forth with evidence from the record, by way of the January 2012 EA, that demonstrates its consideration and balance of several proper uses of the "wilderness" to include recreation and solitude among others. (AR400:16718; AR400:16763). American Whitewater would have this court to read additional requirements and mandates into the statutes and regulations; the court declines to do so.

## 6. FOREST SERVICE MANUALS AND PROCEDURES

To the extent American Whitewater seeks to challenge the 2012 Plan for its alleged failure to comply with the Forest Service's various manuals and procedures (ECF No. 233–1 at 28–29), these claims must also fail. American Whitewater argues specifically that the Forest Service has not complied with certain directives set forth in the United States Forest Service Manual. (ECF No. 233–1 at 28–29). Even assuming the Forest Service's non-compliance, said manuals and procedural guidelines do not have the independent force and effective of law and are not substantive in nature. *See* 36 C.F.R. § 200.4; *W. Radio Servs., Co. v. Espy,* 79 F.3d 896, 901 (9th Cir.1996); *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.,* 100 F.3d 1443, 1450 (9th Cir.1996). Thus, since the United States Forest Service Manual is merely "a general guide for use by Forest Service employees" and is not promulgated in accordance with the procedural requirements of the APA, non-compliance with the manual does not establish a violation of any law. *See Stone Forest Indus., Inc. v. U.S.,* 973 F.2d 1548, 1551 (Fed.Cir.1992); *see also W. Radio Servs.,* 79 F.3d at 896. Accordingly, the court grants judgment for the Forest Service on this claim.

## 7. CONSTITUTIONAL CLAIMS

Finally, American Whitewater alleges the Forest Service's conduct in prohibiting

and limiting whitewater floating on some sections of the Headwaters violates the Due Process and Equal Protection Clauses of the Fifth Amendment to the United States Constitution. (ECF No. 219). Specifically, American Whitewater contends that the headwater restrictions violate American Whitewater's fundamental constitutionally protected liberty interest in the right to interstate travel and personal movement (ECF No. 233–1 at 30–31) and American Whitewater's equal protection rights in that American Whitewater is treated differently from other users who are similarly situated, i.e., hikers and anglers (ECF No. 233–1 at 31–32). The court has considered these arguments and find they have no merit.

First, in order to demonstrate a due process violation, American Whitewater must first show they were deprived of a constitutionally protected liberty or property interest. *See Tigrett v. Rector and Visitors of Univ. Of Va.,* 290 F.3d 620, 628 (4th Cir.2002). American Whitewater cannot make this demonstration because the Forest Service's regulations do not deprive American Whitewater's members of the right to interstate travel as travel between the states along the Chattooga WSR corridor is available by several other means. American Whitewater does not have a "constitutional right to the most convenient form of travel.... Minor restrictions on travel simply do not amount to the denial of a fundamental right...." *Cramer v. Skinner,* 931 F.2d 1020 (5th Cir.1991), cert. denied, 502 U.S. 907, 112 S.Ct. 298, 116 L.Ed.2d 242 (1991). Accordingly, the court grants judgment in favor of the Forest Service on this claim. Next, the court finds that American Whitewater has also failed to establish an equal protection violation. "To succeed on an equal protection claim, a plaintiff must

first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty,* 239 F.3d 648, 654 (4th Cir. 2001). If the initial showing is made, the court then proceeds to determine whether the disparity of treatment can be justified under the requisite level of scrutiny. *Id.* Since American Whitewater fails to show that any difference in treatment between the paddlers and other recreational users is not rationally related to a legitimate purpose, judgment is granted in favor of the Forest Service on this claim as well.

### CONCLUSION

Upon consideration of the arguments of counsel, the memoranda submitted and the applicable law, the court finds that the Forest Service's 2012 Plan for Management of the Chattooga WSR complies with the federal law as set forth and analyzed above. Accordingly, the Forest Service's Motion for Judgment on the Administrative Record is GRANTED. All other pending motions are DENIED.

IT IS SO ORDERED.